ALFRED LULLO, INDIVIDUALLY AND AS PRESIDENT OF THE FIREMEN'S MUTUAL BENEVOLENT ASSOCIATION OF NEW JERSEY, BRANCH NO. 1, AN INCORPORATED ASSOCIATION, AND RICHARD WOOD, INDIVIDUALLY AND AS DELEGATE OF THE FIREMEN'S MUTUAL BENEVOLENT ASSOCIATION OF NEW JERSEY, BRANCH NO. 1, AN INCORPORATED ASSOCIATION, AND THE FIREMEN'S MUTUAL BENEVOLENT ASSOCIATION, BRANCH NO. 1, AN INCORPORATED ASSOCIATION OF THE STATE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 1066, A LABOR ORGANIZATION, THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE NEW JERSEY PUBLIC EMPLOYEES RELATIONS COMMISSION, A COMMISSION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued November 17 and 18, 1969—Decided March 9, 1970.

410

*Mr. Abram A. Lebson* argued the cause for appellants (*Mr. Aaron Dines* of counsel and on the brief; *Messrs. Lebson & Prigoff,* attorneys).

*Mr. Theodore W. Geiser* argued the cause for New Jersey Highway Authority, *amicus curiae* (*Messrs. Pindar, McElroy, Connell, Foley & Geiser,* attorneys).

*Mr. David Friedland* argued the cause for respondent International Association of Fire Fighters, Local 1066 (*Messrs. Friedland, Schneider & Friedland,* attorneys).

*Mr. Francis X. Hayes,* First Assistant Corporation Counsel argued the cause for respondent City of Jersey City (*Mr. James F. Ryan,* Corporation Counsel of City of Jersey City, attorney).

*Mr. Theodore A. Winard,* Deputy Attorney General, argued the cause for respondent Public Employment Relations Commission (*Mr. Stephen Skillman,* Assistant Attorney General, and *Mr. John S. Fitzpatrick,* Deputy Attorney General, on the Supplemental Brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. In this action plaintiffs Lullo and Wood, individually and as officers of the plaintiff Firemen's Mutual Benevolent Association of New Jersey, Branch No. 1, attacked the constitutionality of L. 1968, c. 303, known as "New Jersey Employer-Employee Relations Act." *N. J. S. A.* 34:13A-1 *et seq.* The challenge was two pronged. One was directed at section 7 (*N. J. S. A.* 34:13A-5.3) of the Act which provides that the representative duly elected by a majority of the public employees in an appropriate unit shall be *the exclusive representative* of all employees in the unit. The other challenged the portion of section 7 which authorizes such representative and the employer in the appropriate unit involved to engage in *collective negotiations* concerning the terms and conditions of their employment. It was alleged that in these two respects section 7 is repugnant to Article I, paragraph 19 of the *New Jersey Constitution* of 1947. The trial court sustained the Act, and this Court certified the ensuing appeal while it was awaiting hearing in the Appellate Division.

Since 1895 the Firemen's Mutual Benevolent Association (FMBA), Branch No. 1, has been an incorporated association

of this State. Its membership has always been made up of Jersey City firemen who desired to join. It is not a labor organization in the usual sense and has never held itself out as a negotiating agent for all the firemen of the City. However, on a purely voluntary basis it has interceded for and spoken on behalf of its members with the proper City representatives in matters affecting salaries, working conditions and grievances.

After *L.* 1968, *c.* 303, became effective, the New Jersey Public Employment Relations Commission (PERC) which was created by the Act, acceded to a request of defendant International Association of Fire Fighters, Local 1066 (IAF), a labor organization, and ordered an election to determine if those firemen eligible to vote wished to be represented by IAF for purposes of collective negotiation with Jersey City. *N. J. S. A.* 34:13A–5.2, 5.3, 6. Notice of the time and place of the election and a sample ballot were given to the firemen. As stated in the ballot the question to be voted upon was:

Do you desire to be represented for purposes of collective bargaining by International Association of Fire Fighters, Local 1066?

(Plaintiffs contend the form of this question was improper and invalidated the election. The issue will be discussed later in this opinion.)

Plaintiffs were notified of the election but declined to participate because of their view that *L.* 1968, *c.* 303 is unconstitutional. Instead they instituted this action in the Superior Court, Chancery Division, seeking a declaration of the statute's invalidity and a temporary and permanent injunction against holding the election. The trial judge declined a temporary restraint and directed that the election be held, the result not to be certified until disposition of the court proceeding. See *N. J. S. A.* 34:13A–11; PERC Rule 19:11–19(g). The election was held and 417 of the 430 eligible firemen voted; 399 voted for representation by IAF, 17 voted against such representation, and one vote was not

counted. Thereafter the trial court heard the attack on the statute, and as already indicated sustained its constitutionality.

I

## THE EXCLUSIVE REPRESENTATION ISSUE.

The right of employees in private and public employment to organize and to deal with their employers was dealt with in general terms in Article I, paragraph 19 of the 1947 *Constitution*. It provides:

Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.

The broad terminology of this Article comports with the overall purpose of the delegates to the Constitutional Convention. That purpose was to make the *Constitution* a repository of the fundamental rights of New Jersey citizens, and of the form and functions of our State government. The delegates' philosophy was to create a document which would be sufficiently descriptive and expressive to serve the needs of a basic charter and yet remain free of the detail and methods of implementation that might best be left to the legislative process. The general guidelines for constructing the document were discussed by the then Governor Alfred E. Driscoll at the opening of the Convention. He said among other things:

In the course of your debates you will, on many occasions, be tempted to adopt legislative enactments. You will be wise to guard against this natural temptation by the judicious and conscientious exercise of statesmanship and will power. The State Constitution is an organic document—a basis for government. It should not be a series of legislative enactments. Our search for a modern government in this State has all too frequently been frustrated by legislation enacted by our ancestors over a century ago and embalmed in

our Constitution. When legislation is permitted to infiltrate a constitution, it shackles the hands of the men and women elected by the people to exercise public authority. The longer a constitution, the more quickly it fails to meet the requirements of a society that is never static. To quote one authority: "The more precise and elaborate" the provisions of a constitution, "the greater are the obstacles to the reform of abuses. Litigation thrives on constitutional verbosity."

Accordingly, I earnestly recommend that all proposals of a legislative character be rejected. * * * II. *Proceedings, Constitutional Convention of* 1947, 7.

It is obvious that the drafters of Article I, paragraph 19, were mindful of that admonition. The conclusion is inescapable from a reading of the article. In general language it grants and secures to employees in the private and public sectors certain basic rights. At the same time, it recognizes and clearly projects a difference as between private and public employees in the quality and substance of the rights thus elevated to constitutional stature. Obviously, as *Delaware River & Bay Auth. v. International Org., etc.,* 45 *N. J.* 138, 145 (1965) suggests, employees in private employment were endowed in broad terms with the right to organize and bargain collectively. However, public employees were invested inviolably in significantly narrower terms with the right to organize, present and make known to their public employers their grievances and proposals through representatives of their own choosing. But it is important to note that the delegates made no effort to detail or to prescribe the nature or scope of the representation or the authority of the representative to act for the employees whether their employment was in the public or private sector. The decision as to whether there should be a single representative to speak exclusively for all the employees, or multiple representatives to speak for different groups of employees or whether an individual employee should have the right to represent himself in all dealings with his employer, or whether all three forms of representation should be authorized, was left to the Legislature.

This Court declared in *Board of Ed., Borough of Union Beach v. N. J. E. A.*, 53 *N. J.* 29, 44-45 (1968) that the purpose of Article I, paragraph 19 was to secure the specified rights of employees in private and public employment against legislative erosion or denial. It reveals no intention to deprive the Legislature of the power to grant to public employees a further right designed to implement or effectuate those rights secured by Article I, paragraph 19, or to grant more expansive relevant rights which do not conflict with that article. *Id.*, at 45.

In analyzing Article I, paragraph 19, this Court recognized that the rights secured thereby to public employees are less than those similarly entrenched for private employees. Further, we accepted the thesis that the right of collective bargaining in the full sense in which it obtains in the private employment sector is not guaranteed by the paragraph to public employees. With respect to the latter employees we interpreted the language to impose on the employer in the public sector only the duty to meet with its employees or their chosen representative and to consider in good faith any grievance or proposals presented on their behalf. *Id.*, at 44; *Delaware River & Bay Auth. v. International Org., etc., supra*, 45 *N. J.*, at 144-145. It was in this connection that we referred to the continuing power of the lawmakers to enact such further statutes as may be compatible with Article I, paragraph 19, to both substantively and procedurally flesh out the constitutional guarantees. *Board of Ed., Borough of Union Beach v. N. J. E. A., supra*, 53 *N. J.*, at 45; *Johnson v. Christ Hospital*, 45 *N. J.* 108, 111 n. 1 (1965); *Independent Dairy Workers, etc. v. Milk Drivers & Dairy Employees, Local No. 680*, 30 *N. J.* 173, 180-182 (1959).

In 1966 the Legislature, noting that Article I, paragraph 19 of the *Constitution* "explicitly distinguishes between persons in private employment and persons in public employment with respect to the constitutional right to bargain collectively," created a commission to study the need for establishing an effective procedure for considering the grievances of public

employees. *L.* 1966, *c.* 170. A number of other states have created similar study groups. See Smith, "State and Local Advisory Reports on Public Employment Labor Legislation: A Comparative Analysis," 67 *Mich. L. Rev.* 891 (1969). The New Jersey Commission Report[1] which was filed on January 9, 1968 asserted broadly that "the public interest requires that public employers and public employees be provided with an effective procedure for the mutual resolution of disputes involving terms and conditions of employment." It recommended "legislation setting forth a procedure that is fully compatible with and complementary to existing Civil Service systems and present laws and regulations governing personnel matters in public employment at all governmental levels in New Jersey." In particular it said that such legislation, among other things, "should establish the obligation of public employers * * * to meet with employees through representatives of their own choosing for the mutual resolution, within the law, of grievances and proposals." *Id.* In this connection also, the Report noted:

d. The essential distinction between joint negotiations in public and private employment is that the parties in the public sector do not enjoy the formal coercive power of parties in the private sector, namely the legal right to strike and lockout. In other respects, the broadest latitude for collective negotiations should be available to public employers and public employees. (Report, p. 1).

Under the heading "Administrative Procedures," the Report contains a strong recommendation respecting a primary problem in the present case. It says:

a. When a majority of employees in a given negotiating group or unit indicate by secret election a preference for a specific representative organization, no other organization should be designated, certified, or recognized for the purpose of collective negotiations. (Report, p. 2).

---

[1] Final Report to the Governor and the Legislature of the Public and School Employees' Grievance Procedure Study Commission, 1.

In a later portion of the Report setting forth the recommenda-
tions in greater detail, the following appears at the end of
the above paragraph and as a continuation thereof:

* * * but this should not preclude an employee's right to process
grievances individually. (Report, p. 22, par. c).

On the subject of exclusive representation by a representative
duly elected by public employees in an appropriate unit, the
Commission observed:

Multiplicity of organizations claiming or possessing representation
rights for the same group or unit of employees has long been re-
garded as undesirable. Multiple representation of employees encour-
ages rivalries among employee groups and severely handicaps private
and public employers in the development of effective negotiations and
stable relationships.

Expert witnesses and representatives of interested employer and
employee groups appearing before the Commission were almost
unanimous in their opposition to multiple representation within any
employee negotiating unit. * * * The New Jersey Department of
Civil Service, in its presentation to the Commission, accepted this
viewpoint and advocated restriction of multiple bargaining following
the pattern of the federal executive order. * * * (Report, p. 15).

In preparing the article in 67 *Michigan Law Review, supra,*
Professor Smith surveyed similar reports of special advisory
groups of other states.[2] In discussing them he said:

It was generally agreed that public sector labor legislation should
embrace the principle of exclusive recognition of the union or organi-
zation selected by the majority of employees in a defined bargaining
unit.[3] 67 *Mich. L. Rev.* at 897.

---

[2] Connecticut, February 1965, Minnesota, March 1965, Rhode
Island, February 1966, New York (Taylor Committee), March 1966,
Michigan, February 1967, Illinois, March 1967, New Jersey, Janu-
ary 1968, Pennsylvania, June 1968, and Los Angeles County, July
1968. 67 *Mich. L. Rev.*, at 893–94.

[3] The Professor noted that the New York report merely recom-
mended further study; that of Los Angeles County recommended
recognition of only one organization, that which represents a major-
ity. However, the representation would not be exclusive. 67 *Mich.
L. Rev.* at 898 n. 28.

Chapter 303, L. 1968, was adopted in response to the New Jersey Commission Report and incorporated most of its recommendations. The controversy now before us centers around section 7 of Chapter 303. *N. J. S. A.* 34:13A–5.3. It provides among other things:

Representatives designated or selected by public employees for the purposes of collective negotiation by the majority of the employees in a unit appropriate for such purposes or by the majority of the employees voting in an election conducted by the commission as authorized by this act *shall be the exclusive representatives for collective negotiation concerning the terms and conditions of employment of the employees in such unit.* Nothing herein shall be construed to prevent any official from meeting with an employee organization for the purpose of hearing the views and requests of its members in such unit so long as (a) the majority representative is informed of the meeting; (b) any changes or modifications in terms and conditions of employment are made only through negotiation with the majority representative; and (c) a minority organization shall not present or process grievances. Nothing herein shall be construed to deny to any individual employee his rights under Civil Service laws or regulations. When no majority representative has been selected as the bargaining agent for the unit of which an individual employee is a part, he may present his own grievance either personally or through an appropriate representative or an organization of which he is a member and have such grievance adjusted.

A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership. Proposed new rules or modifications of existing rules governing working conditions shall be negotiated with the majority representative before they are established. In addition, the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances and terms and conditions of employment.

When an agreement is reached on the terms and conditions of employment, it shall be embodied in writing and signed by the authorized representatives of the public employer and the majority representative.

Public employers shall negotiate written policies setting forth grievance procedures by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions affecting them, provided that such grievance procedures shall be included in any agreement entered into between the public employer and the

representative organization. Such grievance procedures may provide for binding arbitration as a means for resolving disputes. (Emphasis added.)

■ Plaintiffs allege that this section which constitutes IAF the exclusive representative of all the employees in the unit for collective negotiation concerning their terms and conditions of employment violates Article I, paragraph 19 of the *Constitution*. In support of the contention they point to the language of paragraph 19 which gives "persons" in public employment the right to organize, present to and make known to their public employers their grievances and proposals "through representatives of their own choosing." Then they seize upon the pluralistic significance of "persons" and urge that the language authorizes any "person" in public employment to present *his* grievances and proposals through a representative of his own choosing. Thus they say that each public employee has been vested with the basic right to present his proposals and grievances to the employer through his individually chosen representative, and that this right, being entrenched in the organic charter, is beyond the power of the Legislature to qualify or dilute. Consequently they claim that section 7 of the statute is invalid because it undertakes to place effectuation of this right exclusively in the hands of a representative elected by a majority of an individual's fellow employees in the designated unit, even though the individual did not vote with the majority or does not belong to the organization selected as the representative.

We cannot accept such a narrow view of the constitutional purpose. It seems obvious to us that the very general language of Article I, paragraph 19 was oriented toward collectivity. The purpose was to secure to employees collectively in the various employer divisions and agencies of government the right to get together—to organize—and to select representatives to present their (*i. e.*, all employees in all divisions and agencies) proposals and grievances. The use of the plural form—"representatives"—signifies an awareness that there would be many different organizations involved and that they

would represent many different groups or units of employees in many separate divisions or agencies of government. It is not reasonable to say that the delegates to the Constitutional Convention, many of whom were described as well informed in the field of labor relations, intended the broad language they employed in paragraph 19 to prevent the Legislature from establishing a commonly known means of giving potency and practical effect to the guaranteed right to organize. *Delaware River & Bay Auth. v. International Org., etc., supra,* 45 *N. J.,* at 144. Surely it could not have been the purpose of such knowledgeable men to give constitutional sanction to the scene of each employee or group of employees in a public agency presenting proposals and grievances through a substantial number of different representatives. Such delegates would have known that "multiplicity of organizations claiming or possessing representation rights for the same group or unit of employees has long been regarded as undesirable. Multiple representation of employees encourages rivalries among employee groups and severely handicaps private and public employers in the development of effective negotiations and stable relationships." Report, *supra,* at 15.

It cannot be overlooked that the delegates to the Convention realized that the particular aspect of labor relations in the public employment sector was being drawn into a New Jersey Constitution for the first time. They were in virgin territory and although they wished to ensconce certain basic guarantees in the charter, obviously they felt the need to phrase them in most general terms and leave to legislative judgment their implementation and augmentation, and particularly the decision as to whether there should be a single representative for all employees, or multiple representation or individual self-representation.

When *Chapter* 303, *L.* 1968, was under consideration by the Legislature, experience on a vast scale in the private employment sector on the national scene had demonstrated that just and harmonious labor relations for both employer and employee are best achieved when the employees' cause is in

the hands of an exclusive representative freely and fairly chosen by a majority of the employees in an appropriate unit.

It seems hardly necessary to explain this principle of majority representation in light of the common acceptance of that principle as an integral part of our democratic form of government. Moreover, that principle of representation was adopted by the National War Labor Board during World War II and likewise was embodied in the Railway Labor Act. See 2 *Teller, Labor Disputes and Collective Bargaining,* § 243, *p.* 688 (1940). As far back as 1903 the pertinency of the principle in industrial relations was spoken of as beyond dispute. In *Wabash Railroad v. Hannahan,* 121 *F.* 563, 571 (E. D. Mo. 1903) the court said:

> The will of the individual must consent to yield to the will of the majority, or no organization either of society into government, capital into combination, or labor into coalition can ever be effected. The individual must yield in order that the many may receive a greater benefit. The right of labor to organize for lawful purposes and by organic agreement to subject the individual members to rules, regulations, and conduct prescribed by the majority is no longer an open question in the jurisprudence of this country.

In 1935 when the National Labor Relations Act was adopted to regulate employer-employee relations in the private employment sector, section 7 thereof, 29 *U. S. C. A.* § 157, provided:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing * * *.

In the 35-year history of the Act the phrase "representatives of their own choosing" has become a phrase of art, designed to convey the intention that the employees' selection of a bargaining representative should be an uncoerced and free choice. See *N. L. R. B. v. Gilmore Industries, Inc.,* 341 *F.* 2d 240, 13 *A. L. R.* 3d 984 (6 Cir. 1965); *N. L. R. B. v. Red Arrow*

*Freight Lines,* 193 *F.* 2d 979 (5 Cir. 1952) ; *N. L. R. B. v. Thompson Products, Inc.,* 162 *F.* 2d 287 (6 Cir. 1947); *N. L. R. B. v. Newark Morning Ledger Co.,* 120 *F.* 2d 262, 137 *A. L. R.* 849 (3 Cir.), *cert.* den. 314 *U. S.* 693, 62 *S. Ct.* 363, 86 *L. Ed.* 554 (1941). It has never been deemed to be inconsistent with the grant of exclusive representation in section 9(a), 29 *U. S. C. A.* § 159(a), which says:

> Representatives designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit \* \* \*. (Emphasis added.)

This meaning of the phrase and the absence of any indication or ruling by the courts that it was inconsistent with the existence of the exclusive representation concept in section 9(a) obviously did not escape the attention of the framers of the 1947 *New Jersey Constitution.* Thus in using the phrase in paragraph 19 of Article I, it is reasonable to assume that their intention was to assure that the choice of a representative in the public sector would be uncoerced and free. Knowing, as they must have, that the language "representatives of their own choosing" had always been considered consistent with exclusive representation in the federal statutory scheme, they could not have intended, as plaintiffs argue here, to exclude such representation in the future simply by using the words "representatives of their own choosing" in the *Constitution.*

When we pass on to an examination of *L.* 1968, *c.* 303, attention is drawn immediately to the almost identical language of its section 7 and that of section 9(a) *supra,* of the Labor Management Relations Act. Since, as we have noted above, there is no conflict between section 7 and 9(a) (29 *U. S. C. A.* § 157, 159(a)) of the federal statute it would seem to follow logically that Article I, paragraph 19 of the *Constitution* and section 7 of our 1968 Act are likewise harmonious and may stand together.

■ A wide-ranging consideration of the problem makes it particularly noteworthy that both section 9(a) of the federal act and our section 7 speak of "representatives designated or selected * * * by the majority of the employees in a unit appropriate for such purposes"; also that both say that representatives "shall be the exclusive representatives" of all the employees in the appropriate unit. The parallelism is not merely coincidental. It is obvious from the Report that the New Jersey Study Commission was conscious of the federal legislation, its mandate for exclusive recognition of the bargaining representative chosen by a majority of the employees involved, the need for such a mandate, the accepted consistency between its sections 7 and 9(a), 29 *U. S. C. A.* §§ 157, 159(a), and the satisfactory experience resulting from its application on the national scene in the private employment sector. Manifestly such knowledge was responsible for the Commission's disparagement of multiple representation of employees in the appropriate unit and its recommendations of exclusivity for the representative freely and fairly chosen by the majority of such employees. See Smith, *supra,* 67 *Mich. L. Rev.,* at 897–98, 901. Adoption by the Legislature of the federal act's language establishing the exclusive representation of the elected representative demonstrates acceptance of the Commission's recommendation in that regard. Further, for purposes of judicial interpretation in a context such as is presented to us here, such legislative approval brings to the fore the well known tenet of statutory construction that the experience and the adjudications under the copied act were probably accepted as an intended guide for the administration of the later act. See 2 *Sutherland, Statutory Construction* (3d ed. 1943) § 5209, p. 551.

In this connection the "s" on "representatives" in both federal and State statutes must be emphasized. The treatment on the national scene of the pluralism is significant in view of plaintiffs' claim that the provision for exclusivity in section 7 of *Chapter* 303, *L.* 1968, transgresses the right

granted to persons in public employment by Article I, paragraph 19, of the 1947 *Constitution* to present their grievances and proposals through "representatives of their own choosing." As we have said, their thesis is that the 1947 *Constitution* gave to each public employee or separate group of such employees the right to have his or their representative present grievances and proposals to the public employer in his or their behalf. Therefore they contend the Legislature is powerless to force individual employees or minority groups of employees to accept the majority representative as his or their sole representative for collective negotiation concerning the terms and conditions of employment. Acceptance of that construction would not only fly in the face of the beneficial and practical evolution of employer-employee relations, but would as hereinafter shown bring about a prejudicial dilution of the basic right to organize as secured by the very general language of paragraph 19.

The labor union movement was born of the realization that a single employee had no substantial economic strength. He had little leverage beyond the sale of his own efforts to aid him in obtaining fair wages, hours of work and working conditions. See *N. L. R. B. v. Jones & Laughlin Steel Corp.*, 301 *U. S.* 1, 33–34, 57 *S. Ct.* 615, 81 *L. Ed.* 893, 909 (1936) ; *N. L. R. B. v. Tidewater Exp. Lines*, 90 *F.* 2d 301 (4 Cir. 1937) ; Wellington & Winter, "The Limits of Collective Bargaining in Public Employment," 78 *Yale L. J.* 1107, 1112 n. 20 (1969). Realization by individual employees that their reasonable expectations were common to their fellow workers turned them toward organization to strengthen and further that community of interest. The concept that in union there is strength and a means of achieving an equitable balance of bargaining power with employers flourished in this country. Ultimately it found legislative acceptance of monumental proportions in the 1935 National Labor Relations Act and its subsequent revisions. It is undisputed the major purpose of Congress in enacting that legislation was to bring about such a balance in private employment.

However, the major aim could not be accomplished if numerous individual employees wished to represent themselves or groups of employees chose different unions or organizations for the purpose. Such absence of solidarity and diffusion of collective strength would promote rivalries, would serve disparate rather than uniform overall objectives, and in many situations would frustrate the employees' community interests. See *Chamberlain, Labor,* 179 (1958). Obviously parity of bargaining power between employers and employees could not be reached in such a framework. So the democratic principle of majority control was introduced on the national scene, and the representative freely chosen by a majority of the employees in an appropriate unit to represent their collective interests in bargaining with the employer was given the exclusive right to do so. 29 *U. S. C. A.* § 159 (a). Thus this policy was built on the premise that by pooling their economic strength and acting through a single representative freely chosen by the majority, the employees in such a unit achieve the most effective means of bargaining with an employer respecting conditions of employment. *N. L. R. B. v. Allis-Chalmers Mfg. Co.,* 388 *U. S.* 175, 87 *S. Ct.* 2001, 18 *L. Ed.* 2d 1123 (1967) ; *Medo Photo Supply Corp. v. N. L. R. B.,* 321 *U. S.* 678, 684, 64 *S. Ct.* 830, 88 *L. Ed.* 1007, 1011 (1944) ; *J. I. Case Co. v. N. L. R. B.,* 321 *U. S.* 332, 338, 64 *S. Ct.* 576, 88 *L. Ed.* 762, 768 (1944). Experience in the private employment sector has established that investment of the bargaining representative of the majority with the exclusive right to represent all the employees in the unit is a sound and salutary prerequisite to effective bargaining. Beyond doubt such exclusivity — the majority rule concept — is now at the core of our national labor policy. *N. L. R. B. v. Allis-Chalmers Mfg. Co., supra,* 388 *U. S.* at 180, 87 *S. Ct.* 2001.

■ Application of the majority rule concept strengthens the right of the individual employee to obtain fair and equitable terms of employment. It brings the collective strength of all the employees in the unit to the negotiating table and

thus enhances the chances of effectuating their community purposes and serving the welfare of the group. The employee who votes against the representative chosen by the majority or who exercises his privilege not to join the organization of the representative suffers no constitutional infringement of his basic freedom of contract right because of the exclusivity principle. Freedom of contract is a qualified, and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. "The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." *N. L. R. B v. Tidewater Exp. Lines, supra,* 90 *F.* 2d at 303.

It follows from what has been said that in the private employment sector the individual employee's right to organize and to bargain collectively has been implemented and made truly meaningful by the legislative mandate for exclusive representation. The exclusivity concept carries with it an equally heavy responsibility toward dissident employees in the unit as for employee-members of the representative organization. Although the representative has the sole right to negotiate and consummate a contract respecting the terms and conditions of employment and the processing of grievances for all employees in the unit, the right to do so must always be exercised with complete good faith, with honesty of purpose and without unfair discrimination against a dissident employee or group of employees. This is true not only in the negotiating of the employer-employee agreement but in its administration as well. *N. L. R. B. v. Allis-Chalmers Mfg. Co., supra,* 388 *U. S.* at 180–181, 87 *S. Ct.* 2001; *Vaca v. Sipes,* 386 *U. S.* 171, 177, 87 *S. Ct.* 903, 17 *L. Ed.* 2d 842 (1967). When the collective bargaining agreement has been made, it becomes the code of the plant and in policing it the union cannot trample upon the rights of a non-member

minority. All must be treated fairly and evenly, particularly with respect to employment of procedures established therein to adjust and settle individual grievances. *Vaca v. Sipes, supra; Donnelly v. United Fruit Co.,* 40 *N. J.* 61, 76, 80 (1963); Wellington, "Union Democracy and Fair Representation: Federal Responsibility in a Federal System," 67 *Yale L. J.* 1327 (1958). Thus although application of the democratic doctrine of majority rule in the area of employer-employee relations requires a dissident individual or minority group of employees to bow to the will of the majority, the wholesome purpose is to supersede the possible terms of individual agreements of employers with terms which reflect the strength and bargaining power and serve the welfare of the group. The terms and advantages of the collective agreement become open to every employee in the represented unit. It has been said that advantages to an employee through an individual contract "may prove as disruptive of industrial peace as disadvantages." Individually negotiated agreements constitute "a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole." *J. I. Case Co. v. N. L. R. B., supra,* 321 *U. S.* at 338–339, 64 *S. Ct.* at 581 *N. L. R. B. v. Allis-Chalmers Mfg. Co., supra,* 388 *U. S.* at 180–181, 87 *S. Ct.* 2001.

Undoubtedly the delegates to the 1947 Constitutional Convention were aware of the exclusivity doctrine which was at the heart of the national employer-employee labor relations policy in the private employment sector. The broad general language they used in drafting Article I, paragraph 19, particularly the portion referring to public employment reveals no express or implied intention to control or regulate, approve or disapprove the rule of majority representation. The Commission plainly was familiar with it and its successful operation as a means of stabilizing industrial

relations in the private sector. For that reason the Report opposed multiple representation of public employees for purposes of negotiating with their employer. It is significant that the Legislature agreed and in adopting section 7 of *L. 1968, c. 303,* used almost the identical language of the federal act, 29 *U. S. C. A.* § 159(a) in mandating that the representative selected by the majority of the employees in an appropriate unit for purposes of collective negotiation shall be the exclusive representative of all the employees for that purpose.

The legislative aim in writing section 7 was to aid, not to hinder, public employees in their relationship with their employers. The purpose was to discourage rivalries among individual employees and employee groups and to avoid the diffusion of negotiating strength which results from multiple representation. On the positive side the Legislature was seeking through the medium of the collective agreement to supersede separate agreements with employees and to substitute a single compact with terms which reflect the strength, negotiating power and welfare of the group. The benefits and advantages of the collective agreement are then open to every employee in the unit whether or not he is a member of the representative organization chosen by the majority of his fellow workers. He can be certain also that in negotiating with the employer the representative is obliged to be conscious of the statutory obligation to serve and protect the interests of all the employees, majority and minority, equally and without hostility or discrimination. And he can rest secure in the knowledge that so long as the union or other organization assumes to act as the statutory representative, it cannot lawfully refuse to perform or neglect to perform fully and in complete good faith the duty, which is inseparable from the power of exclusive representation, to represent the entire membership of the employees in the unit. The obligations of the exclusive representative as they have been described herein evolved largely from experience in ad-

ministering section 9(a) of the National Labor Relations Act, 29 *U. S. C. A.* § 159(a). The absence of any express specifications of the obligations by Congress made it necessary for the courts to define them. The New Jersey Legislature accepted the judicial exposition of the exclusive representative's duty to all employees in the appropriate unit, and made it part of *L.* 1968, *c.* 303, *N. J. S. A.* 34:13A–5.3. The following was included in section 7, *supra*:

A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate agreements covering all employees in the unit and shall be responsible for representing the interests of all such employees without discrimination and without regard to employee organization membership. * * * In addition, the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances and terms and conditions of employment.

The above considerations lead us to the conviction that the creation in section 7 of an exclusive representative under the conditions stated therein is not repugnant to Article I, paragraph 19 of the *Constitution.* Fairly construed in light of the history of employer-employee relations, the section enhances, implements and effectuates the right secured public employees to organize, present and to make known to their public employers their grievances and proposals through representatives of their own choosing. If it could be said that two possible conflicting interpretations exist as to the relationship between the constitutional provision and the exclusivity authorization of the 1968 statute, our view that the *Constitution* and the statute are in fact compatible would remain the same. In such case our feeling that the statute clearly serves the public interest would bring to the fore the principle that the construction favoring constitutionality should be followed. Our duty would plainly be to save and not to destroy the statute.

## II

## THE ALLEGED CONFLICT BETWEEN ARTICLE I, PARAGRAPH 19, AND THE PROVISIONS OF SECTION 7 OF CHAPTER 303, L. 1968, RESPECTING THE HANDLING OF GRIEVANCES.

 Plaintiffs again refer to the portion of paragraph 19 which says: "Persons in public employment shall have the right to * * * present to and make known to * * * [the public employers] their grievances and proposals through representatives of their own choosing." They contend this language confers an unqualified right on each individual public employee or minority group of employees to process his or their own grievances either personally or by a representative of his or their own choosing other than the majority representative. Therefore, they claim the Legislature cannot constitutionally require, as it seeks to do by section 7 of *Chapter* 303, that individual or minority group grievances be processed by the majority representative in accordance with a collective agreement negotiated by such representative.

The allegedly transgressing portions of section 7 are:

A majority representative of public employees in an appropriate unit shall be entitled to act for and to negotiate argeements covering all employees in the unit * * *. In addition, the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances * * *.

\* \* \* \* \* \* \* \*

Public employers shall negotiate written policies setting forth grievance procedures by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions affecting them, provided that such grievance procedures shall be included in any agreement entered into between the public employer and the representative organization. * * *

For reasons expressed above, we have already declared that no unconstitutional repugnancy exists between the por-

tion of Article I, paragraph 19, covering employer-employee relations in the public employment sector and the provision of section 7, *Chapter* 303, conferring the exclusive right and duty on the majority-chosen representative to represent all employees in the unit in negotiating collective agreements. In the private employment sector it is long since settled that the majority representative is the exclusive agent for all the employees in the unit in negotiating the agreement respecting grievances and procedures for handling them. Moreover, when so provided by the agreement, the majority representative has the exclusive right to process all employees' grievances in accordance with the procedure provided therein, so long as the representative acts in complete good faith toward the employee in doing so. *Vaca v. Sipes, supra,* 386 *U. S.* 171, 87 *S. Ct.* 903, 17 *L. Ed.* 2d 842; *Donnelly v. United Fruit Co., supra,* 40 *N. J.* 61; Summers, "Collective Power and Individual Rights in the Collective Agreement — A Comparison of Swedish and American Law," 72 *Yale L. J.* 421 (1963); Cox, "Rights Under a Labor Agreement," 69 *Harv. L. Rev.* 601 (1956).

Plaintiffs say that assuming the rule in private employment has been incorporated in section 7 of *Chapter* 303, it cannot bar an individual employee or minority group of employees from presenting his or their own grievances to the public employer independently of the majority representative. The right of the public employees to act for themselves in that regard, they contend, is vested by the above-quoted language of Article I, paragraph 19. To this the Public Employment Relations Commission answers, that the *Constitution* leaves the handling of grievances to implementation by the Legislature, and further that the democratic principle of majority representation in the processing of grievances is just as compatible with the language of the *Constitution* as it is in the area of exclusive representation.

The Commission contends also that the language of section 7 shows that the Legislature deliberately chose to

accept the basic private employment sector rule and thus assign the processing of grievances to the majority representative, subject, of course, to the stringent requirement that the representative does so in behalf of all employees, dissident and otherwise, in complete good faith.[4] Reference is made to further language of section 7 in support of the contention:

> * * * When no majority representative has been selected as the bargaining agent for the unit of which an individual employee is a part, he may present his own grievance either personally or through an appropriate representative or an organization of which he is a member and have such grievance adjusted.

It is suggested that such language permits an individual employee or group of employees to present his or their own grievances only when no majority representative has been designated or elected. This limitation is emphasized, it is said, by further significant provisions:

> Nothing herein shall be construed to prevent any official from meeting with an employee organization [obviously meaning a minority organization] for the purpose of hearing the views and requests of its members in such unit so long as (a) the majority representative is informed of the meeting; (b) any changes or modifications in terms and conditions of employment are made only through negotiation with the majority representative; and (c) a minority organization shall not present or process grievances. (Insertion ours.)

The Commission urges that the text of the portions of section 7 concerning grievances provides persuasive support for the claim that the authorization for exclusive representation by the majority representative also includes the

---

[4] There can be little question about this in view of the passage of the bill over the Governor's conditional veto, which among other things questioned the constitutionality of granting exclusive control over the grievances of all employees in the unit to the majority representative. Governor's Message to the Senate on Senate Bill No. 746, September 10, 1968, p. 2.

handling of grievances.[5] If this be so, for reasons already expressed, it might well be that no constitutional objection to that course would appear. From a practical standpoint, as the history of labor relations demonstrates, exclusivity in the processing of grievances produces greater stability and reduces industrial unrest. Moreover, says the Commission, the interests of the individual employee are generally served thereby. See Cox, *supra,* 69 *Harv. L. Rev.,* at 621–38. In the handling of his own grievance under the collective agreement, the employee has no more leverage than he would have if he undertook to negotiate all of the terms and conditions of his employment. It is true that with rare exceptions an employee has little knowledge, even less skill and no sufficient financial resources to press his own grievance. He badly needs fair and competent representation. Thus the likelihood is that he would be glad to have the union handle the grievance for him. The important factor safeguarding his interest here is that the law cloaks him with the right to complete good faith service by the majority representative. Arbitrary refusal to process a grievance, discrimination or lack of good faith by the representative in processing the grievance does not leave the employee remediless. See *Vaca v. Sipes, supra,* 386 *U. S.* 171, 87 *S. Ct.* 903; *Donnelly v. United Fruit Co., supra,* 40 *N. J.* 61; Blumrosen, "The Worker and Three Phases of Unionism: Administrative and Judicial Control of the Worker—Union Relationship," 61 *Mich. L. Rev.* 1435, 1484–85 (1963); Cox, *supra,* 69 *Harv. L. Rev.* 601.

In short, the Commission argues that sole representation in the grievance area not only enhances administrative efficiency but increases the responsibility of the elected majority representative as well as its power to act in the

---

[5] Whatever the scope of the authorization, it is subject to the rights of the individual employee under Civil Service laws. Section 7 further provides: "Nothing herein shall be construed to deny to any individual employee his rights under Civil Service laws or regulations."

interest of all the employees. As the Commission puts it, in total effect section 7 gives an agent selected by a majority of the employees a clear choice, *i. e.,* represent fully and give the same measure of devotion to a non-member employee or group of employees or recognize the right of the individual or minority to speak for himself or itself on terms and conditions of employment, and particularly in the matter of grievances. Defendants and the Commission suggest that the overall objective of *Chapter* 303, *L.* 1968, is to mitigate to the extent reasonably possible in a democratic society the perceived imbalance of economic power between public employers and their employees by conferring certain affirmative rights on an agent freely chosen through whom the majority of the employees may speak with one voice in behalf of all of them.

Whatever the arguments of the parties or their persuasiveness respecting the right of an individual employee to process his own grievance, the issue is not before us. The only question properly here is the constitutionality of the provision of section 7 which makes the representative selected by a majority of the employees in an appropriate unit the exclusive representative of all the employees for purposes of collective negotiations with their public employer. No fireman being a non-member of IAF has sought and been refused permission by IAF, or by Jersey City, to present an individual grievance. Nor is there any allegation that such a fireman possessing a grievance has refused IAF's services for the purpose.

The brief of New Jersey Highway Authority as *amicus* reveals that in the case it has pending in the Chancery Division both issues are involved, the exclusive representation question and the right of an individual employee to process his own grievance. The individual involved there did not join in the *amicus* application nor did he appear or file a brief in this case. The trial court has not yet decided the *Authority* case. Under the circumstances we regard the grievance issue as hypothetical and we will await an actual

case before attempting a decision thereon. The 1968 statute under attack is novel legislation for New Jersey. The Commission established to administer it is working in unploughed ground. We expect that many problems both administrative and substantive will confront it in due course. In our judgment the judicial approach must be a gradualistic one calling for the withholding of judgment unless a justiciable issue is actually before us.

## III

### THE COLLECTIVE NEGOTIATION — COLLECTIVE BARGAINING DICHOTOMY.

Plaintiffs argue that the terms "collective negotiation" and "collective bargaining" have the same connotation, and that disguising the latter in the cloak of the former in section 7 of *Chapter* 303, *L.* 1968, cannot change its legal effect. They point out that our 1968 Act grew out of the national experience in employer-employee relations in the private employment sector. In that sector collective bargaining became commonly accepted as signifying a process in which labor and management discussed terms and conditions of employment recognizing that the area is subject to bilateral control. And plaintiffs contend that section 7 undertakes to incorporate all of the substantial rights and privileges that are conferred on the private employer and employee by the Labor Management Relations Act, 29 *U. S. C. A.* § 141 *et seq.* Particularly they call attention to the fact that section 7 gives public employees the right to form, join and assist any employee organization or to refrain from doing so; it provides for recognition of appropriate units of employees for purposes of organization; it excludes supervisory and managerial employees (with some exceptions) from such organizations; it authorizes designation or election of an exclusive bargaining agent by a majority of the employees in the unit; and it establishes such chosen representative as the sole negotia-

tor with the employer respecting terms and conditions of employment, including grievances. The employer and the representative are directed to meet at reasonable times and negotiate in good faith concerning the matters just mentioned. And when agreement is reached it must be embodied in a writing and signed by the representative of the employer and the "majority representative" of the employees. Further the parties are mandated to negotiate written policies setting forth "grievance procedures by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions affecting them," which shall be included in the written collective agreement mentioned above. The paragraph adds that "[s]uch grievance procedures may provide for binding arbitration as a means for resolving disputes."

Plaintiffs urge that these rights and duties and the results of their interplay come within the concept of collective bargaining as it is known on the national scene, and in fact is designated as such in the Labor Management Relations Act, 29 *U. S. C. A.* § 157. From these premises they reason that by the 1968 Act our Legislature really created the type of relationship that operates on the national scene as collective bargaining. Since in the private employment sector nationally the term carries recognition of the right to strike if bargaining results in an impasse, they say we must construe the New Jersey Act as intending to authorize the same action for public employees. The argument seems to conclude on the note that the Act must fall because in totality the grant of exclusive agency to the majority representative coupled with the implied right to strike in public employment run counter to Article I, paragraph 19 of the Constitution.

The logic of the plaintiffs' position is elusive. So far as the constitutionality of the grant of exclusive representation to the majority representative is concerned we have already disposed of that issue, and nothing has been said

under this point to justify any retreat from the views expressed. The attempt to equate "collective negotiating" in section 7 with "collective bargaining" and its significance in the federal act is patently without merit. Aside from everything else it should not escape notice that the right to strike under the Labor Management Relations Act is not regarded as emanating from the provision for "collective bargaining" alone. Section 157 of that enactment (29 *U. S. C. A.* § 157) not only confers the right "to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," but gives also the right "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." It was the sum of the language that cemented into the law the obvious Congressional intention to eliminate any doubt of the right of private employees to strike. See *N. L. R. B. v. Peter C. K. Swiss Choc. Co.,* 130 *F.* 2d 503 (2 Cir. 1942) ; and *cf. Los Angeles Metro. Transit Authority v. Brotherhood of R. R. Trainmen,* 54 *Cal.* 2d 684, 8 Cal. Rptr. 1, 355 *P.* 2d 905 (1960).

The New Jersey Legislature was aware of the possible implications of an authorization of "collective bargaining" in the statute it was about to enact. The Commission Report had scrupulously avoided using the term in making its recommendations. Instead it suggested that public employees be endowed with the right of collective "negotiation," and it made no recommendation that the right to strike be given or recognized. Thus when the lawmakers authorized "collective negotiation" the choice of term was conscious and deliberate. In doing so, they clearly intended to avoid the problem experienced by the California Legislature when "collective bargaining" was authorized and thereafter construed by the Supreme Court to confer the right to strike.[6] See *Los Angeles Metro. Transit Authority v. Brotherhood of*

---

[6] Subsequently enacted statutes substituted "meet and confer" for "collective bargaining." Note, *supra,* 21 *Stan. L. Rev.* at 352.

R. R. Trainmen, supra; Note, "Collective Bargaining and the California Public Teacher," 21 Stan. L. Rev. 340, 350 (1969).

Turning to the Report again, particularly to the section designated "Basic Considerations," it said "* * * the Commission's recommendations must give substance to the constitutional right of public employees to present 'their grievances and proposals through representatives of their own choosing.' This significant phrase implies that public employees have substantial rights to collective representation and negotiation, although perhaps not the full right of collective bargaining accorded to persons in private employment. The critical distinction is in the right to strike, which is commonly regarded as an essential ingredient in free collective bargaining." Report, pp. 13–14. And the Commission went on to say that "on balance [it] believes that neither the public employer nor the public employee has the right to withhold services as a form of coercion to induce settlement of disputes." Report, p. 14. Obviously it was a Legislature fully aware of the absence of the right to strike in the public employment sector that adopted L. 1968, c. 303. It did not grant the right expressly and every reasonable inference from the four corners of the Act demonstrates that it did not do so by implication. See Board of Ed., Borough of Union Beach v. N. J. E. A., supra, 53 N. J., at 46–48; Delaware River & Bay Auth. v. International Org., etc., supra, 45 N. J., at 147–148. Thus we see no substance to plaintiffs' claim that the broad scope of the 1968 Act envisions collective bargaining with all the implications the term carries in the private employment sector, including the right to strike. This conclusion also disposes of the contention based on the further unsound claim that since section 7 grants the right to strike it is unconstitutional because Article I, paragraph 19, bans strikes in public employment. In both the Union Beach and Delaware River & Bay Authority cases cited above we held

.

that the *Constitution* is silent and neutral on the subject of such strikes, neither authorizing nor banning them.

It is crystal clear that in using the term "collective negotiations" the Legislature intended to recognize inherent limitations on the bargaining power of public employer and employee. The reservation in section 7 of the Civil Service rights of the individual employee is a specific indication of that fact. The lawmakers were sensitive that Civil Service statutes in many areas provide for competitive employment examinations, eligible lists, fixed salary lists, for promotion, transfer, reinstatement and removal, and require all employees to be dealt with on the same basis. And undoubtedly they were conscious also that public agencies, departments, etc., cannot abdicate or bargain away their continuing legislative or executive obligations or discretion. Consequently, absent some further changes in pertinent statutes public employers may not be able to make binding contractual commitments relating to certain subjects. See *Smith, supra,* 67 *Mich. L. Rev.* at 904; Rehmus, "Constraints on Local Governments in Public Employee Bargaining," 67 *Mich L. Rev.* 919, 921–30 (1969); Wellington & Winter, *supra,* 78 *Yale L. J* at 1125–27; Note, "Legality and Propriety of Agreements to Arbitrate Major and Minor Disputes in Public Employment," 54 *Cornell L. Rev.* 129 (1968); Annotation, "Union organization and activities of public employees," 31 *A. L. R.* 2d 1142, 1170–1172 (1953); *cf. Norwalk Teachers' Ass'n. v. Board of Education,* 138 *Conn.* 269, 83 *A.* 2d 482, 31 *A. L. R.* 2d 1133 (1951). In our judgment, therefore, the authorization for "collective negotiations" in the 1968 Act was designed to make known that there are salient differences between public and private employment relations which necessarily affect the characteristics of collective bargaining in the public sector. Finally, it signified an effort to make public employers and employees realize that the process of collective bargaining as understood in the private employment sector cannot be transplanted into the public service. *Smith, supra,* 67 *Mich. L. Rev.* at 896.

No specific issue is before us now calling for decision or exposition of the specifics of "collective negotiations," and we refrain from entering that field at this time. Obviously the Legislature envisioned a gradualistic approach with decisions both by PERC and the courts awaiting presentation of individual problems. We agree that in this untilled area expertise is distilled only from experience.

## IV.

### THE FORM OF THE BALLOT.

■ Plaintiffs claim that the form of the ballot fashioned for the election of a majority representative was so misleading as to require setting aside the election.

The ballot read as follows:

Do you desire to be represented for purposes of collective bargaining by International Association of Fire Fighters, Local 1066?
Mark an X on this ballot in one square only.
Make no other mark.

☐ ☐
Yes No

A "Notice of Election" was given to all voters. It informed them that the purpose of the election was "to determine whether those eligible wish to be represented by the International Association of Fire Fighters, Local 1066."

The argument is that if collective bargaining is different from collective negotiation, and the latter term represents the limit of representation, it was confusing and misleading to ask the firemen to make a choice that could not be fulfilled. No evidence was offered to PERC nor was any voter or non-voter produced to suggest that the question was misleading. The result of this kind of election should not be set aside in the absence of a clear showing of prejudice or that the inaccuracy in some way probably had adverse effect on the outcome. We see none here. See *Independent, Inc. v. N. L. R. B.*, 406 *F.* 2d 203 (5 Cir. 1969); *N. L. R. B. v.*

*Mattison Mach. Works,* 365 *U. S.* 123, 81 *S. Ct.* 434, 5 *L. Ed.* 2d 455 (1961).

## V.

For the reasons stated above the judgment of the Chancery Division is affirmed. No costs.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—NONE.