IN THE MATTERS OF NJ TRANSIT BUS OPERATIONS, INC., NEW JERSEY TRANSIT CORPORATION AND AMALGAMATED TRANSIT UNION, NEW JERSEY COUNCIL; NJ TRANSIT MERCER, INC., NEW JERSEY TRANSIT CORPORATION AND UNITED TRANSPORTATION UNION, LOCAL 33 (PATERSON AND WARWICK DIVS.); NJ TRANSIT BUS OPERATIONS, NEW JERSEY TRANSIT CORPORATION AND TRANSPORT WORKERS UNION OF AMERICA, LOCAL 225.

Superior Court of New Jersey
Appellate Division

Argued February 16, 1989—Decided May 10, 1989.

174

Before Judges GAULKIN, BILDER and R.S. COHEN.

*Malcolm A. Goldstein,* of the New York bar, argued the cause pro hac vice for respondent Local 225, Transport Workers Union of America, AFL–CIO (*Feintuch & Porwich,* attorneys).

*Zazzali, Zazzali, Fagella & Nowak,* attorneys for respondent United Transportation Union, Local 33 (Paterson and Warwick Divisions); *Robert A. Fagella,* of counsel.

*Jeffrey Burstein,* Deputy Attorney General, argued the cause for appellants NJ Transit Bus Operations, Inc., NJ Transit Mercer, Inc. and New Jersey Transit Corporation (*Peter N. Perretti, Jr.,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Jeffrey Burstein* and *Harriet H. Miller,* Deputy Attorneys General, on the brief).

*Robert E. Anderson,* General Counsel, argued the cause for respondent Public Employment Relations Commission.

*Jeffrey Freund,* of the District of Columbia bar, argued the cause pro hac vice for respondents The Amalgamated Transit Union, New Jersey Council, The Amalgamated Transit Union Div. 540 and The Amalgamated Transit Union, AFL–CIO (*Reitman, Parsonnet, Maisel & Duggin* and *Weitzman & Rich,* attorneys).

The opinion of the court was delivered by

GAULKIN, P.J.A.D.

In ruling on a series of scope of negotiation petitions filed by the bus operating subsidiaries of New Jersey Transit Corporation (NJT), the Public Employment Relations Commission (PERC) defined for NJT bus employees a scope of negotiations broader than that available to other public employees. NJT appeals.

## I.

NJT was created by the Public Transportation Act of 1979 (PTA) to "provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner." *N.J.S.A.* 27:25–2b, e (West Supp.1988). In 1980, exercising its power "to acquire and operate public transportation assets" (*N.J.S.A.* 27:25–2e), NJT acquired Transport of New Jersey, a private bus company, and its subsidiary, Maplewood Equipment Company. Those entities became a wholly-owned subsidiary of NJT named NJ Transit Bus Operations, Inc. In 1984 NJT acquired Mercer County Improvement Authority, which operated bus services in Mercer County; that entity was renamed NJ Transit Mercer, Inc.

Respondents Amalgamated Transit Union, New Jersey Council, United Transportation Union Local 33, Transport Workers Union of America Local No. 225, and ATU Division 540 represented various groups of employees employed by the acquired

bus lines and now represent, in several negotiating units, employees of NJT.

In 1987, NJT filed with PERC seven scope of negotiations petitions challenging the negotiability of various provisions which respondents sought to include in new labor agreements. NJT asked PERC to find the disputed proposals outside the scope of negotiations and to bar such proposals from interest arbitration proceedings initiated by respondents under *N.J.S.A.* 27:25–14c (West Supp.1988). The petitions were consolidated into a single proceeding. After briefing and oral argument, PERC issued its Decision and Order determining the scope of negotiations under the PTA and the negotiability of each of the challenged contract proposals. NJT appeals, asserting that PERC erred both in its definition of the scope of negotiability and in its application of that standard to the contract proposals.

## II.

In its Decision and Order, PERC described the core question as being "what scope of negotiations did the Legislature authorize when it enacted the [PTA]." The unions' argument, PERC said, was that "the Legislature retained the scope of negotiations set out under the federal Labor–Management Relations Act, 29 *U.S.C.* § 141 *et seq.*" (LMRA), while NJT argued that "the Legislature limited the scope of negotiations to that provided for New Jersey public employees as set forth in New Jersey court cases interpreting the EERA [*i.e.*, the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to 21]." If the LMRA applied, NJT would be required to bargain with the unions over "wages, hours, and other terms and conditions of employment" (29 *U.S.C.* § 158(d)), that is, over issues which "settle an aspect of the relationship between the employers and employees." *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 *U.S.* 157, 178, 92 *S.Ct.* 383, 397, 30 *L.Ed.*2d 341 (1971). If the EERA applied, NJT would be required to negotiate with respect to "terms and conditions of

employment" (*N.J.S.A.* 34:13A–5.3), which have been judicially defined as

> those matters which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy.

*State v. State Supervisory Employees Ass'n.*, 78 *N.J.* 54, 67 (1978).

After making a detailed analysis of the PTA, which it found "much more complicated" than the parties understood, PERC fashioned a negotiability test for NJT bus employees which is a hybrid of LMRA private sector and EERA public sector principles. PERC found that "the Legislature intended that the [NJT bus] employees have [negotiation] rights similar to what they had before the takeover," but that negotiations "cannot preclude" NJT from fulfilling its "statutory mission." To that extent, the employees' "labor relations rights are more limited than they were when these employees were in the private sector." The "statutory mission" test, PERC explained,

> must be more narrowly construed than the negotiability limitation under the EERA. This limitation must come from the [PTA] and [NJT's] responsibility under that statute and cannot be based upon some broad and undefined exercise of managerial authority. The critical distinction would be that 'issues that settle an aspect of the relationship between the employer and the employee,' ... are mandatorily negotiable under this standard even if not under the EERA.

### III.

PERC's findings of legislative intent are not, of course, binding on us. *Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85, 93 (1973). Our reading of the statute leads us to a different conclusion.

The focus of inquiry is *N.J.S.A.* 27:25–14, which addresses employer-employee relations under the PTA. Subsection b states the basic entitlement of NJT employees:

> In accordance with law, employees of the employer shall have and retain their rights to form, join or assist labor organizations and to negotiate collectively through exclusive representatives of their own choosing.

As PERC acknowledged, the use of the word "negotiate" rather than "bargain" is significant. "Bargaining" is the term commonly used in private employment relations, while "negotiating" connotes the more limited rights of public employees. The distinction was thoroughly discussed in *Lullo v. Intern. Assoc. of Fire Fighters*, 55 *N.J.* 409 (1970). There the question was the interpretation of *N.J.S.A.* 34:13A–5.3, the EERA section which authorizes "collective negotiations." The *Lullo* plaintiffs argued, as the unions did here before PERC, that the Legislature intended to incorporate the rights and duties established under the LMRA. Speaking for the Supreme Court, Justice Francis rejected that argument, finding that "when the lawmakers authorized 'collective negotiation' the choice of term was conscious and deliberate." *Id.* at 438. The "crystal clear" legislative intent was "to recognize inherent limitations on the bargaining power of public employer and employee":

> [T]he authorization for 'collective negotiations' in the [EERA] was designed to make known that there are salient differences between public and private employment relations which necessarily affect the characteristics of collective bargaining in the public sector. Finally, it signified an effort to make public employers and employees realize that the process of collective bargaining as understood in the private employment sector cannot be transplanted into the public service.

*Id.* at 440. *See also Tp. of West Windsor v. Public Employment Relations Commission*, 78 *N.J.* 98, 114 (1978); *New Jersey Turnpike Employees' Union, Local 194 v. New Jersey Turnpike Authority*, 64 *N.J.* 579, 581 (1974).

Thus it is fair to infer that the PTA authorization "to negotiate collectively" (*N.J.S.A.* 27:25–14d) incorporates public sector negotiability concepts rather than private sector concepts. That inference is strongly supported by the description in *N.J.S.A.* 27:25–14d of the scope of negotiations:

> It shall be the mutual obligation of the employer and the majority representative of any of its employees to negotiate collectively with respect to mandatorily negotiable subjects which intimately and directly affect the work and welfare of employees. These subjects include wages, hours of work, the maintenance of union security and check-off arrangements, pensions, and other terms and conditions of employment.

*Id.* The obligation to negotiate collectively "with respect to mandatorily negotiable subjects which intimately and directly affect the work and welfare of employees" is precisely the obligation imposed under the EERA. *State Supervisory Employees Ass'n.*, 78 *N.J.* at 67.[1]

PERC accepted that the Legislature adopted that portion of the EERA negotiability test as defined in *State Supervisory Employees Ass'n.* But, PERC observed, the PTA does not recite the limitation stated in *State Supervisory Employees Ass'n.* that negotiable terms and conditions are only those which "would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy." [2] 78 *N.J.* at 67. PERC thus saw an "implication ... that the Legislature wanted [NJT] employees to retain a broader scope of negotiations than that existing for New Jersey's other public employees." PERC found, however, that the PTA's reference to "negotiations" implied a legislative aim to incorporate some kind of public sector negotiating limitations. Eschewing the "management prerogative" formulation, PERC coined its new test: whether the negotiations would "preclude" NJT from "fulfilling" its "statutory mission."

We find that approach unpersuasive. As PERC concedes, the statute must be read as incorporating a limitation on negotiations consistent with the special characteristics of public sector employment relations. While the Legislature did not specifically adopt the "management prerogative" test, neither did it set

---

[1] In negotiations involving a public fire or police department, the EERA separately permits fact-finding on permissive subjects of negotiation. *N.J.S.A.* 34:13A–16b; *Paterson Police P.B.A. v. Paterson*, 87 *N.J.* 78, 87–88 (1981).

[2] After the PTA was enacted, the two-part negotiability test set forth in *State Supervisory Employees Ass'n* was refined to three parts by a separate reference to the fact that a matter is not negotiable under the EERA "if it has been preempted by statute or regulation." *In re IFPTE Local 195 v. State*, 88 *N.J.* 393, 403 (1982). The parties appear to agree that the PTA, however interpreted, is subject to that limitation.

forth the "statutory mission" test created by PERC. Nor did it instruct PERC to create a new negotiability test. There is little justification to conclude that by adopting the scope of negotiations language of *N.J.S.A.* 27:25–14d, the Legislature intended to disregard the standards judicially developed over two decades under the EERA and to have PERC create new standards, solely applicable to NJT bus employees,[3] bottomed on an unclear and uncertain distinction between "management prerogative" and "statutory mission."

PERC and the unions point to other language in the PTA which they say evidences a legislative intent to grant distinctive negotiating rights to NJT bus employees. They rely heavily on *N.J.S.A.* 27:25–14c which directs that in enforcing the rights and duties of NJT and its employees PERC

> shall be guided by the relevant Federal or State labor law and practices, as developed under the "Labor Management Relations Act, 1947" or under the "Railway Labor Act," (45 *U.S.C.* 151 *et seq.*), provided however that employees shall not have the right to strike except as provided by the "Railway Labor Act."

*Id.* The instruction that PERC is to be "guided" by the law and practices developed under federal statutes does not mean, however, that federal law controls or that state law is preempted. In fleshing out the EERA, our Supreme Court has consistently held that "the experiences and adjudications" under the LMRA are an appropriate "guide." *Lullo,* 55 *N.J.* at 424; *In re Bridgewater Township,* 95 *N.J.* 235, 240 (1984); *Galloway Tp. Bd. of Ed. v. Galloway Tp. Assoc. of Ed. Sec'ys.,* 78 *N.J.* 1, 9 (1978). Importantly, the Court has also cautioned that private sector precedents under the LMRA are of limited relevance to scope of negotiation determinations, which are matters peculiar to public employment. *In re IFPTE, Local 195,* 88 *N.J.* at 401, n. 8; *In the Matter of Paterson Police PBA Local No. 1 v.*

---

[3] The parties agree that the governance of the labor relations of NJT's rail operations, conducted through another subsidiary corporation, is preempted by the Railway Labor Act, 45 *U.S.C.* § 151 *et seq.* *United Transportation Union v. Long Island Railroad,* 455 *U.S.* 678, 102 *S.Ct.* 1349, 71 *L.Ed.*2d 547 (1982).

*Paterson,* 87 *N.J.* 78, 90 (1981); *Ridgefield Park Ed. Assn. v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* 144, 159, n. 2 (1978). The statutory direction that PERC "shall be guided" by law and practices developed under federal statutes is therefore entirely consistent with the application of state law principles in scope of negotiation determinations.

Immediately before its "shall be guided" clause, *N.J.S.A.* 27:25–14c directs that

[t]he enforcement of the rights and duties of [NJT] ... and [its] employees shall be governed by the [EERA] and shall be within the jurisdiction of [PERC].

PERC reads that language as establishing "the procedures and forum for seeking enforcement of rights and duties, rather than their substantive boundaries." But that reading is based on PERC's view that the "shall be guided" clause fixes "the substantive boundaries of legal rights and duties." As we have said, we do not find that clause to mandate any substantive standards. We see no reason to narrowly interpret the legislative declaration that "enforcement" of employer and employee rights and duties under the PTA shall be "governed by", the EERA.

PERC and the unions further argue that their reading of the legislative intent is supported by (1) the *N.J.S.A.* 27:25–14b provision that NJT employees shall "retain" their rights to participate in labor organizations and to negotiate collectively through exclusive representatives, (2) the *N.J.S.A.* 27:25–14e language that NJT "shall make provision to assure continuing representation for collective negotiations on behalf of employees" and (3) the *N.J.S.A.* 27:25–14d provision that "mandatorily negotiable subjects" include "maintenance of union security and check-off arrangements" and "pensions." The rights described in *N.J.S.A.* 27:25–14b are those which other public employees enjoy under the EERA; that section does not suggest that NJT employees "retain" unspecified rights enjoyed only by private employees. Similarly the mandate for "continuing representation" in *N.J.S.A.* 27:25–14e does not establish the representatives' scope of negotiations. And, although union

security, check-off arrangements and pensions had been held not mandatorily negotiable under the EERA, that was because of legislative preemption, not because they were matters of "management prerogative." *See New Jersey Turnpike Employees Union v. New Jersey Turnpike Auth.*, 123 *N.J.Super.* 461 (App.Div.1973), aff'd 64 *N.J.* 579 (1974); *Fairlawn Education Ass'n. v. Fairlawn Board of Education*, 79 *N.J.* 574 (1979). In the absence of a statutory bar, union security, check-off arrangements and pensions are unquestionably negotiable under the EERA just as they are under the PTA. *See State Supervisory Employees Ass'n.*, 78 *N.J.* at 80–81; *Matter of Board of Educ. of Town of Boonton*, 99 *N.J.* 523 (1985), *cert. den.*, 475 *U.S.* 1072, 106 *S.Ct.* 1388, 89 *L.Ed.*2d 613 (1986).

The unions also argue that the Legislature structured the PTA to assure that federal funds would be obtained under the Urban Mass Transportation Act of 1964 (49 *U.S.C.App.* § 1602 *et seq.*) (UMTA) and therefore intended a broadened scope of negotiations for NJT employees in obedience to UMTA's section 13(c) (49 *U.S.C.App.* § 1609(c)):

It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements.

In its decision, PERC noted that "[t]he unions ... argued that section 13(c) of UMTA requires that private sector bargaining rights be fully preserved as a condition to receiving federal funds while [NJT] responds that New Jersey's public sector

principles satisfy that condition." PERC found, however, that it "lacked authority to resolve [that] issue" and did not base its scope of negotiations determination on any interpretation of UMTA.

Although it is neither necessary nor appropriate for us to determine what "arrangements" would satisfy section 13(c), we find no persuasive evidence that the scope of negotiations principles established under the EERA would foreclose the Secretary of Labor from granting the approval required of him under the UMTA. In *Jackson Transit Authority v. Amalgamated Transit Union*, 457 *U.S.* 15, 102 *S.Ct.* 2202, 72 *L.Ed.*2d 639 (1982), the Supreme Court held that in enacting section 13(c), "Congress intended that labor relations between transit workers and local governments would be controlled by State law." *Id.* at 24, 102 *S.Ct.* at 2207–2208. The Court later continued:

> Congress made it absolutely clear that it did not intend to create a body of federal law applicable to labor relations between local governmental entities and transit workers. Section 13(c) would not supersede state law, it would leave intact the exclusion of local government employers from the National Labor Relations Act and state courts would retain jurisdiction to determine the application of state policy to local government transit labor relations.

*Id.* at 27, 102 *S.Ct.* at 2209. Thereafter two lower court cases considered union challenges to determinations of the Secretary of Labor that "fair and equitable" protective arrangements had been made by local transit agencies pursuant to section 13(c). In *Local Div. 589 v. Comm. of Mass.*, 666 *F.*2d 618 (1st Cir.1981), *cert.* den. 457 *U.S.* 1117, 102 *S.Ct.* 2928, 73 *L.Ed.*2d 1329 (1982) the court found that "Congress's general intent to secure fair arrangements does not require the implementation of any *particular* set of detailed provisions" and that the statute requires the Secretary of Labor to determine "whether or not a change makes the state system as a whole unfair to the transit workers." In *Amalgamated Transit U.I. AFL–CIO v. Donovan*, 767 *F.*2d 939 (D.C.Cir.1985), the court discussed at length the criteria for determining whether "fair

arrangements" have been made for transit employees. The court held that the section 13(c) requirement

> means, at a minimum, that where employees enjoyed collective bargaining rights prior to public acquisition of the transit system, they are entitled to be represented in meaningful, "good faith" negotiations with their employer over wages, hours and other terms and conditions of employment. Collective bargaining does not exist if an employer retains the power to establish wages, hours and other conditions of employment without the consent of the union or without at least first bargaining in good faith to impasse over disputed mandatory subjects.

*Id.* at 951. Whatever its scope of negotiations, the PTA appears at least facially to satisfy those criteria.

In support of their conflicting contentions, the parties also point to various fragments of legislative history. No purpose would be served by our reciting those materials, for we find no guidance in them. They clearly disclose a recognition that the removal of NJT bus employees from the private to the public sector would create difficult and sensitive labor relations problems. But the available evidence as to whether or how the legislators understood or intended those problems to be resolved is at best vague and equivocal.

## IV.

In sum, there is little in the substance, language or history of the PTA evidencing a legislative intent to provide a scope of negotiations for NJT employees broader than that available to other New Jersey public employees under the EERA. To the contrary, the PTA can fairly be read as requiring NJT employees to be subject to the same rules as all other public employees. The consistent use of the word "negotiate" rather than "bargain" implies the limitations on public sector employment relations which have been carefully developed in our case law over many years. The obligation stated in *N.J. S.A.* 27:25–14d that the parties "negotiate collectively with respect to mandatorily negotiable subjects which intimately and directly affect the work and welfare of employees" is drawn directly from that case law. *State Supervisory Employees*

*Ass'n,* 78 *N.J.* at 67. The legislative direction that the enforcement of the rights and duties of NJT and its employees "shall be governed" by the EERA and within the jurisdiction of PERC suggests that PERC's role is the same under both statutes. And there is nothing in the PTA that directly distinguishes the rights and duties of NJT and its employees from those of other public employers and employees under the EERA.

Considerations of common sense and sound public policy also support the inference that the Legislature intended NJT employees to be subject to the same rules that apply to other public employees. In adopting the EERA, the Legislature did not attempt to fix the scope of negotiations beyond saying that "terms and conditions of employment" are negotiable (*N.J.S.A.* 34:13A–5.3); it left further definition to case-by-case development by the courts.[4] In adopting the PTA, the Legislature again chose not to be definitive, although to the limited extent it addressed the scope issue, the Legislature employed the language of the case law developed under the EERA. In the absence of a "clear and distinct" legislative expression to the contrary (*Burlington Cty. Col. Fac. Ass'n v. Bd. of Trustees,* 64 *N.J.* 10, 16 (1973)), we find it unreasonable to infer that the Legislature intended to reject the EERA case law and to authorize PERC to chart a new and different course of negotiations for NJT bus employees alone, especially one turning on an obscure distinction between protecting a public agency's "management prerogative" (EERA) and protecting its "statutory mission" (PTA, as interpreted by PERC.) *Cf. State Supervisory Employees Ass'n.* 78 *N.J.* at 74, 79. Such a course would hardly assure the "continued labor stability" which PERC itself called a central aim of the PTA.

We accordingly reverse PERC's Decision and Order and remand the matter to PERC for reconsideration and redetermi-

---

[4]The Legislature has since amended the EERA to expand the judicially-stated scope of negotiations in certain particulars. See *L.* 1979, *c.* 477, § 2 (*N.J.S.A.* 34:13A–5.5); *L.* 1982, *c.* 103, § 1 (*N.J.S.A.* 34:13A–5.3).

nation of the scope of negotiations petitions in conformity with
this opinion.