**UNIVERSITY OF NEW HAMPSHIRE CHAPTER OF the AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS et al.**

v.

**Edward HASELTON, Chairman of the State Personnel Commission, et al.**

**Civ. A. No. 74–188.**

United States District Court,
D. New Hampshire.

June 6, 1975.

Paul McEachern, Shaines, Madrigan & McEachern, Portsmouth, N. H., for plaintiffs.

Charles G. Cleaveland, Asst. Atty. Gen., State of New Hampshire, Concord, N. H., for defendants.

Before COFFIN, Circuit Judge, and GIGNOUX and BOWNES, District Judges.

### OPINION

BOWNES, *District Judge.*

This is an action brought pursuant to 28 U.S.C. § 2281 and § 2284. Plaintiffs[1] requested that a Three-

---

1. Plaintiffs are the University of New Hampshire Chapter of the American Association of University Professors (Association), Richard Downs, an academic employee of the University of New Hampshire and President of the University of New Hampshire Chapter of the American Association of University Professors, and Sam Rosen, an academic employee of the University of New Hampshire.

Judge Court be convened to declare unconstitutional and permanently enjoin the operation of N.H. RSA 98–C as it applies to them. N.H. RSA 98–C is a public employment relations statute which confers upon state employees the right to engage in collective bargaining. The statute defines employees as:

> classified employees of the state, and non-academic employees (exclusive of department heads and executive officers) of the University of New Hampshire including Keene State College and Plymouth State College as defined by the board of trustees of the university . . .. N.H. RSA 98–C:1

The net effect of the statutory classification is to confer collective bargaining rights upon state employees in general, while specifically denying these rights to the academic employees of the State University System.[2] Academic employees of the New Hampshire Vocational-Technical Colleges are not specifically excluded by the statutory terms and these persons have the right to engage in collective bargaining.[3]

## THE FACTS

The facts are not in dispute. On May 10, 1974, plaintiff Association, supported by the signatures of approximately one hundred sixty academic employees of the University of New Hampshire at Durham, petitioned the defendants,[4] pursuant to the provisions of N.H. RSA 98–C, claiming the right and authority to act as the exclusive bargaining representative for the academic employees at the Durham campus.

On May 21, 1974, defendants refused to entertain plaintiffs' petition on the ground that Durham academic employees were excluded from the enabling provisions of N.H. RSA 98–C.

There are two issues before the court:

(1) Whether the State's refusal to confer collective bargaining rights upon academic employees is an abridgment of their First Amendment rights; and

(2) Whether the statutory classification created by N.H. RSA 98–C violates the equal protection clause of the Fourteenth Amendment.

## RULINGS OF LAW

*First Amendment*

■ The First Amendment rights of association, assembly, and freedom of speech guarantee to public employees the right to organize collectively and select representatives to engage in collective bargaining. *McLaughlin* v. *Tilendis*, 398 F.2d 287 (7th Cir. 1968); *Police Officers' Guild, Nat. U. Of Pol. Of.* v. *Washington*, 369 F.Supp. 543 (D.D.C. 1973); *United Federation of Postal Clerks* v. *Blount*, 325 F.Supp. 879 (D.D.C.1971); *National Association of Letter Carriers* v. *Blount*, 305 F.Supp. 546 (D.D.C.1969). The Supreme Court has characterized "the right to organize and select representatives for lawful purposes of collective bargaining . . . as a 'fundamental right' . . .." *Auto. Workers* v. *Wis. Board*, 336 U.S. 245, 259, 69 S.Ct. 516, 524, 93 L.Ed. 651 (1948).

■ Plaintiffs do not allege nor has there been any showing that their First Amendment rights are impinged by the operation of N.H. RSA 98–C. As far as plaintiffs are concerned, the statute maintains the status quo; they are free to unionize in order to advance their

---

2. By explicit statutory language, the National Labor Relations Act excludes the State and its agencies from its provisions. 29 U.S.C. § 152(2) (1964). Accordingly, public employees must look to their states for the authority to engage in collective bargaining.

3. There are six Vocational Technical Colleges in New Hampshire. They are part of the State Board of Education. These colleges offer one-year diploma programs and a two-year Associates Degree in Applied Science Programs. The colleges prepare the student for a career in "industrial vocational occupations."

4. Named as defendants are: Edward Haselton, Chairman of the State Personnel Commission, Robert Duvall, Commissioner of Labor, and Robert Stark, Secretary of State of the State of New Hampshire.

ideas and interests. The State, however, does not have a constitutional obligation to respond to plaintiffs' demands or to enter into a contract with them. There is no

constitutional right . . . to make collective bargaining mandatory. As a matter of Constitutional law, this Court agrees with the other courts which have held that no such right exists. See Lontine v. Van Cleave, 483 F.2d 966, 968 (10th Cir. 1973); Newport News Fire Fighters Ass'n Local 794 v. City of Newport News, 339 F.Supp. 13, 17 (E.D.Va. 1972); Atkins v. City of Charlotte, 296 F.Supp. 1068, 1077 (W.D.N.C. 1969); Cook County Police Ass'n v. City of Harvey, 8 Ill.App.3d 147, 289 N.E.2d 226 (1972). As was stated in *Atkins, supra* 296 F.Supp. at 1077:

"There is nothing in the United States Constitution which entitles one to have a contract with another who does not want it. It is but a step further to hold that the state may lawfully forbid such contracts with its instrumentalities. The solution, if there be one, from the viewpoint of the firemen, is that labor unions may someday persuade state government of the asserted value of collective bargaining agreements, but this is a political matter and does not yield to judicial solution." [The right to a collective bargaining agreement, so firmly entrenched in American labor-management relations, rests upon national legislation and not upon the federal Constitution.] *Confederation of Police* v. *City of Chicago*, 382 F. Supp. 624, 628–629 (N.D.Ill.1974).

Traditionally, the right to be recognized in the collective bargaining process has been hammered out either through the legislative process or by the economic forge of the strike, and not by judicial decrees.[5] *Cf. Timberlane Reg. Sch. Dist.* v. *Timberlane Reg. Ed. Ass'n,* 317 A.2d 555 (N.H.1974). The operation of N.H. RSA 98–C does not impede the plaintiffs' rights to collectively organize or participate in an economic strike. Plaintiffs' First Amendment rights remain untarnished and unaffected.

## EQUAL PROTECTION CLAIM

■■ Whenever a state statute is alleged to be violative of the equal protection clause the court must inquire, as to the interests and rights affected by the statutory classification, in order to determine the appropriate standard of review. *Dunn* v. *Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Since we find that the statutory classification, created by N.H. RSA 98–C, does not interfere with a "fundamental right," our standard of review is the rational basis test. In resolving the equal protection dispute, we ask ourselves whether denying academic employees of the University of New Hampshire the statutory right to engage in collective bargaining is reasonably related to a legitimate governmental purpose. *McGinnis* v. *Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973); *Shelton* v. *Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231 (1960). We find that it is.

■ Collective bargaining is a recent phenomenon in higher education.[6] The university community remained the last bastion against the spread of collective bargaining for two essential reasons:

5. Brown, Collective Bargaining in Higher Education, 67 Mich.L.Rev. 1067, 1079–1080 (1969); Dole, State and Local Public Employee Collective Bargaining in the Absence of Explicit Legislative Authorization, 54 Iowa L.Rev. 539 (1969).

6. "As of June 1, 1973, eighteen states have enacted public employment relation statutes applicable to academic employees in all state or local institutions of higher learning. Due to the rapidly expanding concept of bargaining in the public sector, there exist great difficulties at any point in time in determining exactly which states allow collective negotiations among their academic personnel." Gee, Organizing the Halls of Ivy: Developing a Framework for Viable Alternatives in Higher Education Employment, 1973 Utah L.Rev. 233, n. 2. *See generally,* Wollett, The Status and Trends of Collective Negotiations for Faculty in Higher Education, 1971 Wis. L.Rev. 2.

first, most universities have internal governance procedures;[7] and, second, many academics believed that their professional status and independence would be tarnished by the collective bargaining process.

Ideally, the governance of a university is based upon the concept of "shared authority."[8] Central to the concept is the tenet that academics are given extensive authority to participate in university governance. The theory is that the university setting, unlike the industrial world, is a single community comprised of an amalgamation of components which, in a joint effort, create an atmosphere of mutuality and cooperation. *Cf. N.L.R.B.* v. *Wentworth Institute,* 515 F.2d 550 at 556 (1st Cir. 1975).

In order to effectuate the goals of shared authority, most higher institutions have established university senates. A properly balanced senate, which evenly disperses power and control, enabling the faculty to have an active participation in university governance, negates the need for collective bargaining.[9] The need to collectively bargain arises only when academics believe that they are not effectively represented in the process of institutional decision-making.[10]

An examination of the governance system at the Durham campus indicates that academic authority is more elusive than shared. In 1969 the governing structure of the University was changed so that, for the first time in any university, undergraduates were given parity with the faculty in a single unicameral body. The traditional academic senate was abolished. At present, the University Senate serves as an advisory body to the Board of Trustees. The entire University community is represented in the Senate: students, hourly employees, and professional and technical employees. The faculty has only minority representation.

The major administrative officers of the University are appointed without either the advice or consent of the faculty. The faculty has no voice in matters of tenure, salary or faculty appointments. These decisions are made solely by the administration with only minimal faculty advisement.

But the structure of the University's governance can change again, as it did in 1969. The New Hampshire University Senate was the subject of a recent study which suggested numerous changes in the Senate's structure so as to make it a more effective mechanism for faculty participation. (Azzi Commission on University Governance). At present, the proposal has not been initiated.

Despite the fact that the academic employees at the Durham campus do not effectively partake in the University's governance, as they do in many other universities, we find that a rational basis does exist for the legislature's refusal to extend collective bargaining to university academic employees.

Although collective bargaining in educational circles has gained increasing acceptance, its critics have pointed out that it injects into university decision-making an adversarial process resting on the influence of the bargaining unit.[11]

7. The literature on the scope and role of university governance is bountiful. *See,* Note, The Bargaining Unit Status of Academic Department Chairman, 40 U.Chi.L. Rev. 442, n. 3 (1973).

8. For a working definition of "shared authority," *see* Gee, *supra* note 6, at n. 57.

9. Brown, Professors and Unions: The Faculty Senate: An Effective Alternative to Collective Bargaining in Higher Education? 12 W. & M. L. Rev. 252 (1970).

10. *Id.* at 278.

11. "Collective negotiations is itself a political system, and the leaders of a faculty collective negotiations structure—the negotiators, the executive boards, the departmental stewards—are themselves politicians. They are not enlisted in the service of reasonableness, rationality or the persuasive power of ideas. They are concerned with getting more, as management is with giving less. They understand that their ability to achieve this objective depends upon the effective mobili-

The dynamics of this process, it is argued, is egalitarian and majoritarian, and, the process of making trade-offs to reach a settlement, may result in a failure to recognize the interests inherent in a wide diversity of disciplines,[12] with consequent adverse effect on some professors.[13]

Fearing the effect of these forces on an institution of higher learning, a Task Force of the American Association of Higher Education recommended, in 1966, that, in order to promote the spirit of cooperation, a university should use internal governance mechanisms rather than resorting to external bargaining techniques.[14] While controversy continues, the commentators seem to agree on one point—that the employment conditions in higher education are unique and deserve special statutory consideration.[15] We cannot fail to observe also that where collective bargaining for academ-

ics has been introduced into public universities, it has been accomplished mainly by statute. *See* note 6, *supra*. And the Court of Appeals for this Circuit has implicitly recognized the propriety of legislative judgment in this area.[16]

We recite these observations not to take sides on an issue of great complexity, but to indicate that the New Hampshire legislature in excluding the Durham faculty from the collective bargaining statute was not lacking in a rational basis for its decision. Specifically, it could conclude that a faculty bargaining unit, particularly if it sought to bargain broadly on curriculum, admissions, degree requirements, and other educational policy matters, would undermine and disrupt its present effort at university-wide governance. No similar internal governance experiment is being undertaken at the vocational schools. The legislature could also conclude that the dis-

zation and utilization of political power." Wollett, *supra* note 6, at 32.

12. "Collective negotiations in universities and colleges places all academic disciplines at the same bargaining table. . . . In some areas involving items such as curriculum, academic programs, admission requirements, and other similar variables, the diversity of disciplines could create significant problems of reconciliation for negotiators and their constituents.

"Collective bargaining involves tradeoffs in order to reach a mutual settlement. In the heat of negotiations, especially as a strike deadline looms over the proceedings, there is a strong temptation to trade items rather than settle on the true merits of each. This, of course, is characteristic of any bargaining situation, but 'horse-trading' of issues without careful consideration of the long-run impact could be exceedingly disastrous in such a highly-complex and diversified field as higher education." Allen, Organizing the Eggheads: Professors and Collective Bargaining, 23 Lab.L.J. 606, 614 (1972).

13. "Collective bargaining inherently subjects many policy determinations to the rule of the organizational majority, and majority rule often reflects deep suspicion of individual initiative or advantage. Thus, collective negotiations could have an adverse effect on teachers with special ability." Wollett, The Coming Revolution in Public School Management, 67 Mich.L.Rev. 1017, 1029 (1969). By

the same token, we recognize that in the absence of collective bargaining many other junior faculty members of a faculty may feel equally adversely affected.

14. American Association of Higher Education Task Force Report, Faculty Participation in Academic Government cited in Brown, *supra* note 9, at 284.

15. Gee, *supra* note 6, at 234; Sherman and Loeffler, Universities, Unions, and The Rule of Law: The Teaching Assistants at Wisconsin, 1971 Wis.L.Rev. 187, 225–228; Comment, The Legislation Necessary to Effectively Govern Collective Bargaining in Public Higher Education, 1971 Wis.L.Rev. 275.

16. *Cf. N.L.R.B.* v. *Wentworth Institute, supra*, 515 F.2d at 556 where the First Circuit implicitly recognized that the legislature may deny or grant academic employees the benefits of collective bargaining. "Collective bargaining by an exclusive faculty bargaining agent under the rules of the Act will supposedly result in the erosion of academic freedom and meritocratic values, and in the substitution of adversarial attitudes for traditional collegiality and shared responsibility.

"We do not take Wentworth's views lightly, and *were we a legislature we might reach a different result.*" (Emphasis added.) The New Hampshire legislature is presently considering legislation which would amend the statutory language so that academic employees are included in the Public Employment Relations Act.

parate interests of various academic departments in the University would not be as well served by collective treatment as the more unified interests of the vocational schools. We think there is sufficient dissimilarity between the vocational colleges and the University to support a legislative distinction. We note finally that the legislature may be given some latitude for experimentation in attempting to resolve the problems of internal relationships in the academic setting. *See Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

In balancing the benefits and detriments that collective bargaining in higher education could produce, we find that it is reasonable for the State to exclude University of New Hampshire academic employees from the benefits conferred by N.H. RSA 98–C.

So ordered.