674 A.2d 199

### IN THE MATTER OF THE DIVISION OF CRIMINAL JUSTICE STATE INVESTIGATORS.

Superior Court of New Jersey
Appellate Division

Argued January 16, 1996—Decided April 16, 1996.

428

430

Before Judges HAVEY, D'ANNUNZIO and CONLEY.

*Leon B. Savetsky* argued the cause for appellant New Jersey Division of Criminal Justice State Investigators (*Loccke & Correia*, attorneys; *Mr. Savetsky* and *Joseph Licata*, on the brief).

*Carol Johnston*, Deputy Attorney General, argued the cause for respondent State of New Jersey (*Deborah T. Poritz*, Attorney General, attorney; *Catherine M. Brown*, Senior Deputy Attorney General, of counsel, and *Ms. Brown* and *Ms. Johnston*, on the brief).

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Petitioner, the New Jersey Division of Criminal Justice State Investigators, appeals from an order of the Public Employment Relations Commission (PERC) dismissing its petition for representation. Respondent, State of New Jersey, Division of Criminal Justice (Division), is the public employer of the petitioning employees. Petitioner attacks the validity of *N.J.S.A.* 52:17B–100(b)

(hereafter section 100(b)), which classifies the petitioning employees as "confidential" for the purposes of the New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21, thereby relieving respondent of any duty to engage in collective negotiations with them.

Petitioner argues that section 100(b) deprives the petitioning employees of their rights: (1) to organize, pursuant to *N.J. Const.* art. I, ¶ 19; (2) of association and assembly, pursuant to *U.S. Const.* amends. I and XIV; (3) to equal protection, pursuant to *N.J. Const.* art. I, ¶ 1 and *U.S. Const.* amend. XIV; and (4) to freedom from special legislation, pursuant to *N.J. Const.* art. IV, § 7, ¶ 7. PERC declined to decide any of these issues.

*N.J. Const.* art. I, ¶ 19 provides:

> Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.

Thus, the New Jersey Constitution distinguishes between private sector and public sector employees regarding the right to bargain collectively. The New Jersey Supreme Court recognized this distinction in *Delaware River and Bay Auth. v. International Org. of Masters, Mates and Pilots,* 45 *N.J.* 138, 144–48, 211 *A.*2d 789 (1965). The Court ruled that public employees did not have the constitutional right to strike or to bargain collectively. The Court relied in part on a 1942 report of the Governor's Committee on State–Employee Relations. *Id.* at 144, 211 *A.*2d 789. The Court noted that the report

> recogniz[ed] the right of public employees to organize and be heard through representatives of their own choosing on questions of wages, hours, and working conditions generally, but point[ed] out that public employees do not have, in any full sense, the collective bargaining rights available to private employees and may not engage in the coercive activities available to the latter.
>
> [*Ibid.*]

The Court also cited a 1954 Opinion of the Attorney General issued in response to an inquiry made by the South Jersey Port

Commission. *Id.* at 145, 211 *A.*2d 789. The Attorney General concluded:

> (1) that the Commission's employees have the right to form a union, (2) that they have no right to collective bargaining in its full sense but do have a right to meet, through representatives of their own choosing, with representatives of the Commission who are obligated to hear proposals and grievances and determine, in good faith, whether they are meritorious, feasible and satisfactory to the Commission.
>
> [*Ibid.*]

The Court concluded that "*Article I, par.* 19 of the Constitution clearly recognizes the distinction between public and private employees." *Ibid.*

In 1968, the Legislature extended to certain public employees the right to bargain collectively through employee organizations, and established the correlative duty of a public employer to negotiate with the duly selected representatives of its employees. *N.J.S.A.* 34:13A–5.3 (hereafter section 5.3). The Supreme Court upheld the validity of section 5.3 in *Lullo v. International Ass'n of Fire Fighters,* 55 *N.J.* 409, 262 *A.*2d 681 (1970). In so ruling, the Court restated the constitutional distinction between public and private sector employees:

> In analyzing Article I, paragraph 19, this Court recognized that the rights secured thereby to public employees are less than those similarly entrenched for private employees. Further, we accepted the thesis that the right of collective bargaining in the full sense in which it obtains in the private employment sector is not guaranteed by the paragraph to public employees. With respect to the latter employees we interpreted the language to impose on the employer in the public sector only the duty to meet with its employees or their chosen representative and to consider in good faith any grievance or proposals presented on their behalf.
>
> [*Id.* at 416, 262 *A.*2d 681 (citing *Board of Ed., Borough of Union Beach v. N.J.E.A.,* 53 *N.J.* 29, 44, 247 *A.*2d 867 (1968)).]

The Court held that Article I, paragraph 19 does not "deprive the Legislature of the power to grant to public employees a further right designed to implement or effectuate those rights secured by Article I, paragraph 19, or to grant more expansive relevant rights which do not conflict with that article." *Id.* at 416, 262 *A.*2d 681 (citing *Board of Ed., Borough of Union Beach, supra,* 53 *N.J.* at 45, 247 *A.*2d 867).

Section 5.3 recognizes exceptions to the statutorily created right to collective bargaining in the public sector. It provides that, "this right shall not extend to elected officials, members of boards and commissions, managerial executives, or confidential employees." *Ibid.*

*N.J.S.A.* 34:13A–3(g) defines the phrase "confidential employees." It provides:

> (g) "Confidential employees" of a public employer means employees whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiating unit incompatible with their official duties.

Section 100(b), the statute at issue in this appeal, was a 1981 amendment to the Criminal Justice Act of 1970, *N.J.S.A.* 52:17B–97 to –117. It provides:

> All employees of the division, except for secretarial and clerical personnel, shall be in the unclassified service of the civil service of the State. All unclassified employees of the division shall be deemed confidential employees for the purposes of the "New Jersey Employer–Employee Relations Act", P.L.1941, c. 100 (C. 34:13A–1 et seq.).
>
> [*N.J.S.A.* 52:17B–100(b).]

Section 100(b), in effect, broadens the definition of "confidential employee" contained in *N.J.S.A.* 34:13A–3(g) to include certain division personnel, including petitioner herein. Consequently, under section 100(b), the respondent has no duty to engage in collective bargaining with the petitioning employees in the present case.

Petitioner's contention that section 100(b) deprives the petitioning employees of their rights under Article I, paragraph 19, and their rights of association and assembly under the First Amendment of the United States Constitution, is without merit. As previously indicated, Article I, paragraph 19 provides only limited rights to public employees. Section 100(b) does not impair those rights; it merely withholds rights created by statute. Similarly, section 100(b) does not burden the petitioning employee's rights of association and assembly; rather, it merely eliminates the employer's duty to negotiate collectively.

The United States Supreme Court considered a similar issue in *Smith v. Arkansas State Highway Employees,* 441 *U.S.* 463, 99 *S.Ct.* 1826, 60 *L.Ed.*2d 360 (1979). There, the State Highway Commission refused to consider a grievance unless the employee submitted it personally. *Id.* at 463, 99 *S.Ct.* at 1827, 60 *L.Ed.*2d at 362. In the private sector, this policy probably would have constituted an unfair labor practice, as it impaired or undermined the union's effectiveness in representing its members. *Id.* at 465, 99 *S.Ct.* at 1828, 60 *L.Ed.*2d at 363. The Court explained:

> The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances. And it protects the right of associations to engage in advocacy on behalf of their members. . . .
>
> But the First Amendment is not a substitute for the national labor relations laws. . . . The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so. But the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it.
>
> [*Id.* at 464–65, 99 *S.Ct.* at 1827–28, 60 *L.Ed.*2d at 362–63 (citations omitted) (footnote omitted).]

The Court concluded that "all that the Commission has done in its challenged conduct is simply to ignore the union. That it is free to do." *Id.* at 466, 99 *S.Ct.* at 1828, 60 *L.Ed.*2d at 363.

*Hanover Tp. Fed'n of Teachers Local 1954 v. Hanover Community School Corp.,* 457 *F.*2d 456 (7th Cir.1972), and *Atkins v. City of Charlotte,* 296 *F.Supp.* 1068 (W.D.N.C.1969), explained why the First Amendment guarantees public employees a right to join unions, but not to bargain or negotiate collectively. In *Hanover,* the local school board "refused to engage in meaningful bargaining with the union," and discharged nine of the union's most active leaders. 457 *F.*2d at 458. The school board then mailed individual contracts to the remaining employees which, according to the union, "violated a duty to negotiate ... and was intended to undermine and destroy the union," in violation of the employees' First Amendment rights. *Id.* at 459. The court of appeals agreed with the district court that the discharge of the nine union leaders violated their rights to association and advocacy, "since there is no

reason to distinguish a union from any other association." *Id.* at 460 (footnote omitted). "[P]ublic employees cannot be discharged for engaging in 'union activities.'" *Ibid.* The court explained:

> Such protected "union activities" include advocacy and persuasion in organizing the union and enlarging its membership, and also in the expression of its views to employees and to the public. For that reason, the State may not broadly condemn all union activities or discharge its employees simply because they join a union or participate in its activities. It does not follow, however, that all activities of a union or its members are constitutionally protected.
>
> Thus, the economic activities of a group of persons (whether representing labor or management) who associate together to achieve a common purpose are not protected by the First Amendment. Such activities may be either prohibited or protected as a matter of legislative policy.
>
> [*Id.* at 460–61 (footnotes omitted).]

The court noted that the mailing of the individual contracts would have constituted an unfair labor practice under federal law, undermined the union's economic strength, and "deprived the teachers of benefits they sought to obtain by exercising their First Amendment rights." *Id.* at 461. Nevertheless, there was no constitutional duty to bargain collectively. *Ibid.* The First Amendment "provides no guarantee that a speech will persuade or that advocacy will be effective." *Ibid.*

In *Atkins,* cited by petitioner, the court considered two North Carolina statutes, *N.C. Gen.Stat.* 95–97 and 98. 296 *F.Supp.* at 1070. Section 97 prohibited government employees from joining or assisting in the organization of any labor union which was or may become affiliated with a national or international organization, and which had collective bargaining as a purpose. *Ibid.* The court held that this provision was "void on its face as an abridgment of freedom of association protected by the First and Fourteenth Amendments of the Constitution of the United States. The flaw in it is an intolerable 'over-breadth' unnecessary to the protection of valid state interests." *Id.* at 1075 (citation omitted). "We think there is no valid state interest in denying firemen [plaintiffs] the right to organize a labor union—whether local or national in scope." *Ibid.*

The second statute the court considered, *N.C. Gen.Stat.* 95–98, voided any agreement or contract between any public employer and any labor union. *Id.* at 1071. The court upheld this provision:

> There is nothing in the United States Constitution which entitles one to have a contract with another who does not want it. It is but a step further to hold that the state may lawfully forbid such contracts with its instrumentalities. The solution, if there be one, from the viewpoint of the firemen, is that labor unions may someday persuade state government of the asserted value of collective bargaining agreements, but this is a political matter and does not yield to judicial solution. The right to a collective bargaining agreement, so firmly entrenched in American labor-management relations, rests upon national legislation and not upon the federal Constitution. The State is within the powers reserved to it to refuse to enter into such agreements and so to declare by statute.
>
> [*Id.* at 1077.]

Following the lead of these two cases, the federal courts have consistently refused to compel public employers to engage in collective bargaining or negotiations with their employees. In *Fraternal Order of Police v. Mayor and City Council of Ocean City, Md.*, 916 *F.*2d 919 (4th Cir.1990), the union alleged that a city charter provision, which prohibited collective bargaining, violated its rights under the First and Fourteenth Amendments. *Id.* at 921. The court said: "The First Amendment protects the right to speak freely, to advocate ideas, and to petition government for redress of grievances, but it does not guarantee the right to collective bargaining. Consequently, nothing prohibits a government body from proscribing collective bargaining." *Ibid. Accord, Local Union No. 370, Int'l Union of Operating Eng'rs v. Detrick,* 592 *F.*2d 1045, 1046 (9th Cir.1979) (holding that a county had no duty to bargain with a union of its employees); *Sikes v. Boone,* 562 *F.Supp.* 74, 79 (N.D.Fla.), (noting that deputy sheriffs had "no constitutional right to mandatory collective bargaining"), *aff'd.,* 723 *F.*2d 918 (11th Cir.1983), *cert. denied,* 466 *U.S.* 959, 104 *S.Ct.* 2171, 80 *L.Ed.*2d 555 (1984) (citations omitted); *Winston–Salem/Forsyth County Unit of the N.C. Ass'n of Educators v. Phillips,* 381 *F.Supp.* 644, 646 (M.D.N.C.1974) ("[T]he Constitution does not mandate that anyone, either the government or private parties, be compelled to talk to or contract with an organization."); *Newport*

*News Fire Fighters Ass'n Local 794 v. City of Newport News, Va.,* 339 *F.Supp.* 13, 17 (E.D.Va.1972) (holding that a city cannot be required "to enter into collective bargaining sessions with an association of its employees").

▪ Thus, the First Amendment does not give public employees the right to require their employers to negotiate or bargain collectively. The cases upon which petitioner relies support their rights to organize, join a union and advocate, but do not stand for any right of public employees to compel their employers to bargain or negotiate with the employees' representative.

In the present case, the petitioning employees contend that the deprivation of their rights to organize and negotiate, pursuant to section 100(b), violates their right to equal protection of the laws under both *U.S. Const.* amend. XIV, and *N.J. Const.* art. I, ¶ 1. Petitioner also argues that there is no legitimate public need or reason which justifies the deprivation of these rights.

*U.S. Const.* amend. XIV, § 1 provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

▪ *N.J. Const.* art. I, ¶ 1 provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." Although the phrase "equal protection" is not expressed in this provision, the New Jersey Supreme Court has interpreted it as protecting "against injustice and against the unequal treatment of those who should be treated alike. To this extent, article 1 safeguards values like those encompassed by the principles of due process and equal protection." *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985).

▪ Under federal equal protection analysis, if a statute regulates a "fundamental right" or a "suspect class," it is subject to "strict scrutiny," so that the statute must establish or further "a

compelling state interest," and there must be no less restrictive means or alternative available to achieve the objective. *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 365, 526 *A.*2d 1055 (1987); *Greenberg, supra*, 99 *N.J.* at 564, 494 *A.*2d 294. "Intermediate scrutiny" applies when a statute regulates a semi-suspect class, such as gender, or indirectly affects a fundamental right; under this standard, "the classification must serve an important governmental objective and must be substantially related to the achievement of those objectives." *Barone, supra*, 107 *N.J.* at 365, 526 *A.*2d 1055 (citation omitted); *Greenberg, supra*, 99 *N.J.* at 565, 494 *A.*2d 294. Finally, the "rational basis" test applies if there are no fundamental rights or suspect or semi-suspect classes involved; under this test, "the statute must be rationally related to the achievement of a legitimate state interest." *Barone, supra*, 107 *N.J.* at 365, 526 *A.*2d 1055 (citation omitted).

■ Under the New Jersey Constitution, on the other hand, our courts utilize a balancing test, considering "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." *Id.* at 368, 526 *A.*2d 1055; *Greenberg, supra*, 99 *N.J.* at 567, 494 *A.*2d 294 (citations omitted). The federal and state tests "will often yield the same results," but there may be circumstances in which "the State Constitution provides greater protections." *Barone, supra*, 107 *N.J.* at 368, 526 *A.*2d 1055.

■ In the present case, we reject petitioner's contention that the strict scrutiny standard applies. Section 100(b) does not affect a fundamental right such as a right of assembly or association. Its impact is limited to the statutory right to compel a public employer to bargain collectively. As previously indicated, that right is not fundamental in the public sector. *Lullo v. International Ass'n of Fire Fighters, supra*, 55 *N.J.* at 416, 262 *A.*2d 681; *Board of Ed., Borough of Union Beach v. N.J.E.A., supra*, 53 *N.J.* at 44, 247 *A.*2d 867.

*George Harms Constr. Co. v. New Jersey Turnpike Auth.*, 137 *N.J.* 8, 644 *A.2d* 76, (1994), relied on by petitioner, is not to the

contrary. In striking down the Turnpike Authority's requirement that its contractors enter into project labor agreements with certain specified unions, the Court applied a strict scrutiny test because it deemed the right to organize and bargain collectively as "fundamental." *Id.* at 28–29, 644 *A.2d* 76. However, this case is inapposite because it did not involve the rights of the public employees; it involved only the constitutionally protected rights of the private sector employees of a private contractor bidding on a public project. We conclude that the rational basis test applies in the present case.

The issue, therefore, is whether the State has a legitimate interest in denying investigators employed by the Division of Criminal Justice the right to bargain collectively with their employer, when other similarly situated law enforcement officers enjoy this right. The focus of petitioner's argument in this regard is the different treatment afforded petitioner's employees compared with county investigators employed by county prosecutors under *N.J.S.A.* 2A:157–10.

Courts from other jurisdictions have considered equal protection challenges to statutory schemes allowing some categories of public employees, but not others, to negotiate collectively.[1] Applying the rational basis test, they have been extremely reluctant to invalidate legislative classifications, citing the obvious differences between the categories of employees.

Accordingly, a state may allow non-academic employees to negotiate collectively, but not academic employees. *University of N.H. Chapter of AAUP v. Haselton,* 397 *F.Supp.* 107 (D.N.H.1975); *Ohio Univ. Faculty Ass'n v. Ohio Univ.,* 5 *Ohio App.*3d 130, 449 *N.E.*2d 792 (1982). A state may allow certificated

---

[1] The parties point out that the New Jersey Legislature has selected certain other groups of State employees to be ineligible to negotiate collectively. All Casino Control Commission and Division of Gaming Enforcement employees are "confidential" for the purposes of the Employer–Employee Relations Act. *N.J.S.A.* 5:12–54(d) and *N.J.S.A.* 5:12–56(b). Deputy and Assistant Attorneys-General are "confidential" for the purposes of the Act. *L.* 1994, *c.* 161, § 1.

but not non-certificated public school employees to negotiate collectively. *Charles County Supporting Servs. Employees Local Union 301 v. Board of Educ.*, 48 *Md.App.* 339, 427 *A.*2d 1025 (1981). A state or city may prohibit police officers from engaging in collective negotiations, while allowing other public employees to do so. *Confederation of Police v. City of Chicago*, 529 *F.*2d 89 (7th Cir.), *vacated*, 427 *U.S.* 902, 96 *S.Ct.* 3186, 49 *L.Ed.*2d 1196 (1976), *aff'd.*, 547 *F.*2d 375 (7th Cir.1977); *Vorbeck v. McNeal*, 407 *F.Supp.* 733 (E.D.Mo.), *aff'd. mem.*, 426 *U.S.* 943, 96 *S.Ct.* 3160, 49 *L.Ed.*2d 1180 (1976). A state may allow firefighters, but not police, to engage in limited collective bargaining, since the Legislature "could rationally conclude that the public interest demands a closer degree of control over police than over firefighters. Whether this decision is correct or not, whether it represents wise policy, is not our affair." *Beverlin v. Board of Police Comm'rs.*, 722 *F.*2d 395, 396 (8th Cir.1983).

The present case, however, does not involve a legislative distinction between law enforcement personnel and other public employees; the distinction is between two groups of law enforcement personnel.

The Legislature created the Division of Criminal Justice in 1970, when it enacted the Criminal Justice Act of 1970(Act). *P.L.* 1970, *c.* 74. The Legislature had preceded passage of the Act by several expressions of its concern regarding crime. Senate Concurrent Resolution Number 44, adopted March 11, 1968, established a Special Joint Legislative Committee To Study Crime And The System of Criminal Justice In New Jersey (Special Committee). In its report the Special Committee stated:

> Thus, this Committee finds the system of administering criminal justice to be complex, fragmented both in functions and jurisdiction, undernourished, without focus or command, largely invisible as to what is really happening, nowhere near as effective as we believe it should be—and neglected.
>
> It is neglected in the largest and most important matters, such as leadership, drive and understanding.

The Special Committee's report expressed the opinion that no one was "in charge" of the State's criminal justice system, that no one

"watches over it, as a whole or in its respective parts," and that no one "is concerned with its largest questions of over-all direction and effectiveness."

In light of these concerns, the Special Committee recommended creation of a Department of Criminal Justice "that will equip our State with leadership capacity and coordinated capability for a truly effective fight against crime." A bill, S–802, was introduced in 1968 to establish such a department. It was the subject of extensive hearings and opposition. Then Attorney General Sills testified that it was unnecessary to create a new department outside the purview of the Attorney General, when the Department of Law and Public Safety could fulfill the law enforcement function if given the proper resources. Other opponents of the bill expressed their concern that a separate Department of Criminal Justice possessing the powers contained in S–802 would be an overwhelming police presence, thereby threatening civil liberties. The bill did not pass. However, other recommendations of the Special Committee were implemented. They included the New Jersey Wiretapping and Electronics Surveillance Control Act, *N.J.S.A.* 2A:156A–1 *et. seq.*, and the creation of the State Commission of Investigation, *N.J.S.A.* 52:9M–1 *et seq.*

In 1970, the Legislature invited then United States Attorney for the District of New Jersey, Frederick B. Lacey, to make "recommendations relative to changes in the laws of those States which may be helpful in the fight against organized crime." Lacey did so in a report titled *Recommendations to the 1970 Session of the New Jersey Legislature*, January 20, 1970. Lacey agreed that "it is time to reorganize and alter the prosecutorial system in New Jersey." *Id.* at 49, 644 *A.2d* 76. He observed that "[s]uch changes are particularly needed to enhance the prosecution by state authorities of offenses committed by the higher-echelon members of Organized Crime." *Ibid.* Lacey observed that those cases "are invariably complex, require many man hours of investigation, and demand of a prosecutor intense, thorough preparation." *Ibid.*

Lacey recommended legislation establishing a Division of Criminal Justice within the Department of Law and Public Safety, under the supervision of the Attorney General. *Ibid.* Lacey defined the role of the Division:

> The Legislature should establish the Division so as to enable the Attorney General to sever from the ordinary prosecutorial process, and thereafter treat specially, offenses in which there is reason to believe members of Organized Crime are involved. Because of the clandestine nature of most of these offenses and the insulated position of the highly placed professional criminals, such cases present problems of investigation and prosecution which the County Prosecutors ... should not be required to bear alone. Therefore, the implementing legislation should require the respective County Prosecutors to inform the Attorney General of all cases which appear to have Organized Crime implications. It should further provide that the Attorney General, on his own initiative, may assume control of such cases and organize the investigation and prosecution thereof, through the use of the State Grand Jury and otherwise. This latter power should be delegable by the Attorney General (either wholly or partially) to the Assistant Attorney General in charge of the Division.
>
> In organizing the state's efforts in an organized crime case, the Attorney General should have the greatest possible flexibility. He should be able to assign the investigative function either to local, county or state investigative personnel, or to direct that there be a coordinated effort among two or more such units. He should be empowered to assign prosecution of the case to one or more of the following: Deputy Attorneys General in the Division, the County Prosecutor or Assistant County Prosecutor in a County where the crime took place, County Prosecutors or Assistants from other counties, or specially retained counsel. The use of Deputy Attorneys General in such cases is particularly advisable because such persons could specialize in Organized Crime cases, unencumbered by the case loads borne by county prosecutors, thus developing an expertise therein.
>
> [*Id.* at 50–51, 644 A.2d 76 (footnote omitted).]

Within four months of Lacey's report, without committee hearings, the Legislature passed, and Governor Cahill signed, the Act creating the Division. An understanding of the role of the Division and the Attorney General in New Jersey's criminal justice system requires detailed references to the Act.

We begin with the Legislature's declaration of policy, contained in *N.J.S.A.* 52:17B–98:

> The Legislature recognizes that the existence of organized crime presents a serious threat to our political, social and economic institutions and helps bring about a loss of popular confidence in the agencies of government. Accordingly, it is hereby declared to be the public policy of this State to encourage cooperation among law enforcement officers and to provide for the general supervision of

criminal justice by the Attorney General as chief law enforcement officer of the State, in order to secure the benefits of a uniform and efficient enforcement of the criminal law and the administration of criminal justice throughout the State. All the provisions of this act shall be liberally construed to achieve these ends and administered and enforced with a view to carrying out the above declaration of policy.

At issue in this appeal is section 100(b). Section 100(a) assists us in placing section 100(b) in perspective. It provides:

The Attorney General shall organize the work of the division in such bureaus and other organizational units as he may determine to be necessary for efficient and effective operation and shall assign to the division such employees in the Department of Law and Public Safety as may be necessary to assist the director in the performance of his duties.

In 1977, the Legislature amended the Act by creating the "position of State Investigator which shall be in the unclassified service of the civil service." *N.J.S.A.* 52:17B–100.1. The amendment authorized the Attorney General "to appoint ... suitable persons to serve as State investigators to serve at his pleasure and subject to removal by him." *Ibid.*

Thus, section 100(b), adopted in 1981, by eliminating the Attorney General's duty to bargain collectively with Division personnel, facilitates implementation of the flexible authority granted to the Attorney General in section 100(a).

The Act also defined the Attorney General's authority in relation to county prosecutors. *N.J.S.A.* 52:17B–103 requires the Attorney General to "maintain a general supervision over said county prosecutor." *Ibid.* It authorizes the Attorney General to "conduct periodic evaluations of each county prosecutor's office including audits ... of each county prosecutor['s] [office]." *Ibid.*

*N.J.S.A.* 52:17B–105 authorizes any county prosecutor to request the Attorney General's assistance in the conduct of any criminal investigation or proceeding; and empowers the Attorney General to "take whatever action he deems necessary to assist the county prosecutor in the discharge of his duties." *Ibid.*

However, the Attorney General need not wait for a request from a county prosecutor for assistance. *N.J.S.A.* 52:17B–107 empowers the Attorney General to supersede a county prosecutor

in any criminal investigation or proceeding, and to participate in or initiate any criminal investigation or proceeding, in furtherance of the interests of the State. Finally, *N.J.S.A.* 52:17B–106 requires the Attorney General to "supersede the county prosecutor for the purpose of prosecuting all of the criminal business of the State in said county," when requested by the Governor. The Attorney General has discretionary power to so act when requested "by a grand jury or the board of chosen freeholders of a county or the assignment judge of the superior court for the county." *Ibid.*

The Legislature established the Division because of a perceived need to create a law enforcement agency capable of responding to the menace of organized crime. The Division was created because of a perception that county prosecutor's offices could not adequately respond to organized criminal activity.

The Legislature, however, gave the Attorney General the power to supersede county prosecutors in any type of criminal proceeding, not merely proceedings or investigations involving organized crime. In addition, the Legislature gave the Attorney General the duty to "maintain a general supervision" over the county prosecutors. *N.J.S.A.* 52:17B–103. The Attorney General exercises these powers through the Division. In effect then, the Division is the law enforcement agency of last resort in New Jersey.

" 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' " *Barone, supra,* 107 *N.J.* at 367, 526 *A.*2d 1055 (quoting *McGowan v. Maryland,* 366 *U.S.* 420, 426, 81 *S.Ct.* 1101, 1105, 6 *L.Ed.*2d 393, 399 (1961)). Nor will it be set aside if it is rationally related to a legitimate government purpose. *Ibid.* Under the New Jersey Constitution, we weigh the impact of a classification against its justification and decide if the classification is arbitrary. *Barone, supra,* 107 *N.J.* at 368, 526 *A.*2d 1055. We ask whether a legitimate government interest is suitably furthered by differential treatment. *Ibid.* In the present case we conclude that the classifi-

cation effected under section 100(b) does not violate the Federal or State constitution.

By withholding the right of collective bargaining, section 100(b) is consistent with section 100(a)'s mandate to the Attorney General to "organize the ... division ... as he may determine to be necessary for efficient and effective operation and ... [to] assign to the division such employees in the Department of Law and Public Safety as may be necessary to assist the director in the performance of his duties." *N.J.S.A.* 52:17B–100(a). The duty to negotiate would dilute the Attorney General's authority regarding working hours, the structure of the workweek, discipline and procedures for effecting transfers, reassignments and layoffs, as well as other negotiable elements of the employment relation. *See generally, In re IFPTE Local 195 v. State,* 88 *N.J.* 393, 443 *A.*2d 187 (1982); *State v. State Supervisory Employees Ass'n.,* 78 *N.J.* 54, 393 *A.*2d 233 (1978); *Township of West Windsor v. Public Employment Relations Comm.,* 78 *N.J.* 98, 393 *A.*2d 255 (1978); *Red Bank Regional Educ. Ass'n. v. Red Bank Regional High School Bd. of Educ.,* 78 *N.J.* 122, 393 *A.*2d 267 (1978); *cf. In re Hunterdon County Bd. of Freeholders,* 116 *N.J.* 322, 561 *A.*2d 597 (1989) (holding that implementation and termination of safety incentive programs were mandatory subjects of collective negotiations); *Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n.,* 94 *N.J.* 9, 462 *A.*2d 137 (1983) (ruling that teacher's claim of reverse discrimination was grievable, though not subject to binding arbitration); *Rutgers v. Council of AAUP Chapters,* 256 *N.J.Super.* 104, 606 *A.*2d 822 (App.Div.1992) (holding that a proposal requiring reasons for rejection of candidate for reappointment or promotion, notice of actual vote, and permitting candidate to submit additional information were subject to mandatory negotiation), *affirmed o.b.* 131 *N.J.* 118, 618 *A.*2d 853 (1993). The duty to "negotiate written policies setting forth grievance and disciplinary review procedures by means of which ... employees or [their] representatives ... may appeal the interpretation, application or violation of policies, agreements, and administrative decisions, including disciplinary determinations, affecting them," *N.J.S.A.*

34:13A–5.3, would have a significant impact on the Attorney General's authority.

It is not irrational, therefore, for the Legislature to have concluded that a duty to bargain collectively with representatives of the Division's investigators regarding the terms and conditions of employment would impair the Attorney General's ability to assure that the Division fulfills its role in the State's criminal justice system. In particular, the Legislature rationally could have concluded that restrictions on the Attorney General's authority to assign and to discipline Division investigators would impair her/his ability to police and maintain the effectiveness and integrity of the Division's personnel. *Cf. State v. State Troopers Fraternal Ass'n.*, 134 *N.J.* 393, 417, 634 *A.*2d 478 (1993) (holding that the negotiability of disciplinary review procedures mandated in *N.J.S.A.* 34:13A–5.3 does not apply to the Division of State Police because "negotiability of such procedures would infringe unacceptably on one of the most important managerial prerogatives of the Superintendent [of state police]"). Moreover, in light of the Division's sensitive role as the State's law enforcement agency of last resort, the Legislature rationally could have concluded that the right to bargain collectively, if granted to the Division's investigators, would create an intolerable divided loyalty.

Petitioner's contention that section 100(b) constitutes "special" legislation in violation of *N.J. Const.* art. IV, § 7, ¶ 8, is clearly without merit. *R.* 2:11–3(e)(1)(E).

Affirmed.